**Soghomon ABOVIAN; Lousine Abovian; Iskoui Abovian, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 98–70934.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 8, 2000

Filed July 19, 2000

---

Yeu S. Hong, Popkin, Shamir & Golan, Los Angeles, California, for the petitioners.

Robbin K. Blaya, Civil Division, Department of Justice, Washington, D.C., for the respondent.

Before: WALLACE, PREGERSON, and THOMAS, Circuit Judges.

Opinion by Judge PREGERSON; Dissent by Judge WALLACE.

PREGERSON, Circuit Judge:

■ Soghomon Abovian, his wife Iskoui Abovian, and their twenty-three-year-old daughter Lousine are natives and citizens of Armenia. They petition for review of the Board of Immigration Appeal's ("BIA's") de novo decision denying their requests for asylum and withholding of deportation. Iskoui and Lousine Abovian are derivative applicants whose petitions depend exclusively on the merits of Soghomon Abovian's ("Abovian's") petition. Although the Immigration Judge ("IJ") made no credibility finding at all, the BIA made an independent adverse credibility finding and denied Abovian's request for asylum and withholding of deportation in part on this basis. Alternatively, assuming Abovian's credibility, the BIA found that he did not show past persecution or a well-founded fear of persecution on account of political opinion and denied him relief from deportation on this basis as well. We have jurisdiction to review the BIA's final order in this case under 8 U.S.C. § 1105a(a).[1] We grant the petition for review and remand for further proceedings consistent with this opinion.

---

1. Because the Abovians were in deportation proceedings before April 1, 1997, and the BIA issued its final order of deportation after October 31, 1996, this petition for review is governed by former Immigration and Nationality Act ("INA") § 106 as modified by Illegal Immigration Reform and Immigrant Responsibility Act's ("IIRIRA's") transitional rules. Thus, this court has jurisdiction to review the BIA's order of deportation under 8 U.S.C. § 1105a(a), as amended by IIRIRA § 309(c).

## I. FACTUAL BACKGROUND

Petitioners Soghomon Abovian ("Abovian"), his wife Iskoui, and their daughter Lousine are citizens of Armenia. Their six-year-old son was born in this country and is a U.S. citizen. Both Abovian's mother and Iskoui Abovian's parents are permanent United States residents. Abovian, as lead petitioner, concedes deportability but seeks asylum and withholding of deportation on the basis of past persecution or a well-founded fear of future persecution because he refuses to work for and adopt the ideology of the KGB and its successor the National Security Council ("NSC"). The root of Abovian's intense opposition to communism and the KGB was his father's zealous endorsement of both.

Abovian was born in Damascas, Syria, on March 10, 1941, to a family of Armenian heritage. His father, a staunch supporter of communism, was the First Secretary General of the Communist Party in Damascas from 1934 to 1947. Abovian's father also worked for the Soviet KGB in Syria during the same period of time. In 1947, the communists were forced to leave Syria, and Abovian's father led a group of Armenian communists back to Armenia. Abovian's father continued to work for the Communist Party and as a spy for the KGB in Armenia. Abovian's father's communist leadership was well-known throughout the community.

Abovian's aversion to communism began when he was a young boy. He felt ashamed of his father's affiliation with the KGB and strongly opposed the Communist Party. Since he was fourteen, Abovian fought his father's communist teachings and was even thrown out of school a number of times because he refused to advocate the principles of communism. When he was sixteen, Abovian left home and moved to Kazakstan to escape the legacy of his father.

Abovian lived in Kazakstan for two years until he was conscripted into the Soviet Army for the compulsory three years of service in October 1960. When Abovian learned that he was going to be stationed in Cuba, he refused to go. As a result, Abovian was physically beaten and placed in the army jail for six months. He has visible scars from the beatings he endured while in jail. After he was released, Abovian still refused to go to Cuba. He was sent to a military hospital's mental ward in Tbilisi, Georgia. After a month, he was released but was declared "unfit" for military service because he was deemed "mentally ill." Once branded mentally ill, Abovian could not get a driver's license or an education at a university. Additionally, because the KGB approved all job placements, Abovian was only able to obtain menial jobs.

From 1962 through 1988, Abovian moved from city to city within the Soviet Union looking for work. He was contacted by the Soviet Army every five years to see whether he had changed his mind about communism, but because he refused to accede to communist political beliefs, Abovian's official mental illness stamp on his papers was renewed for another five years. Once, the KGB threw Abovian into a hole in the ground that was filled with water and snakes to convince him to work for the KGB. He still refused. As a result, the KGB continued to periodically harass and abuse Abovian for the next 26 years.

While on a visit to Armenia, Abovian met his wife Iskoui and married her. They settled in the Soviet Union.

In 1988 conflicts in Armenia heightened and the Russian Army began sending its troops there to keep the peace. As a result of hostility against Armenians in Russia, the Abovians returned to Armenia to live. From 1988 to 1990, Armenia had no official government. The Soviet Constitution was the only law in the country, and the KGB was still in control of national security. Abovian alleges that, even after the fall of the Soviet Union and the democratic elections in 1990, the KGB—now

called the NSC—was still running the country.

The KGB/NSC in Armenia took Abovian in for questioning on numerous occasions. He was ridiculed and threatened for not becoming a member of the KGB like his father. They demanded that he work for them, specifically as a Turkish translator, and told him that if he did not he would "suffer the consequences for the rest of [his] life." In 1991, Abovian was interrogated by the KGB about his membership in an informal social group promoting "real independence" for Armenia. Abovian told them that he would never work for the KGB/NSC or spread their "pro-Russia" ideology.

Not long after this interrogation, Abovian and his family began receiving threatening telephone calls. In June 1993, Abovian decided to send his wife, who was pregnant at the time, to America to visit her parents to avoid any problems with the KGB/NSC.

Shortly after his wife left for the United States, Abovian's then-seventeen-year-old daughter, Lousine, was hit by a car while sitting on a bench outside their apartment building in Armenia. Lousine spent twenty days in the hospital due to her injuries. She recognized the driver of the car as a man who she had seen speaking with her father on a number of occasions. Abovian believed that the driver was associated with Ter–Petrosyan, the President of Armenia at the time and the leader of the KGB/NSC. Abovian testified that he was told that his daughter was harmed because of his stubbornness and that he should not report the incident to the police. When Abovian did report the accident, the police tried to force Lousine to identify the wrong person.

On August 21, 1993 the Abovians had a baby boy, born a United States citizen. Days after their son's birth, someone kidnaped Abovian's daughter on her way home from school. Abovian was told that the men who had interrogated him previously were the ones who had kidnaped his daughter Lousine. Abovian met with Ter–Petrosyan and was told that he was "playing with our honor" by refusing to work for them as his father had. The facts suggest that Ter–Petrosyan and the Armenian Communists would not tolerate the political fallout from Abovian's refusal to work for them. They, in essence, gave him an ultimatum: work for us or leave Armenia. Because he still refused, Abovian was told that he would have to leave Armenia immediately. He claims that they knew that his wife was in America and was told to get visas for himself and his daughter. Lousine was held for 18 days until Abovian obtained the necessary paperwork to leave the country.

The American Embassy would not grant Lousine an interview, so on February 11, 1994 she traveled to Mexico and then entered the United States on February 14, 1994. Abovian flew directly from Armenia to Los Angeles on February 17, 1994, on a tourist visa. Before leaving he was thoroughly checked to make sure that he was not taking any documents out of the country. He had given his military papers to his mother who came to America earlier and is now a permanent legal resident of the United States. Abovian was also forced to sign over his apartment and sign papers stating that if he returns to Armenia he will be taken to court. Abovian claims that communism is still a real threat in Armenia. He fears that if he is forced to return he will be killed because of his refusal to accept the communist ideology and work for the KGB/NSC.

## II. ANALYSIS

 We review the BIA's determination that an alien has not established eligibility for asylum or withholding deportation under the substantial evidence standard. See Singh v. INS, 134 F.3d 962, 966 (9th Cir.1998). Substantial evidence can be found lacking only if the applicant shows that the evidence which he presented "was so compelling that no

reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *see Prasad v. INS,* 47 F.3d 336, 338 (9th Cir. 1995).

■ "We review de novo claims of due process violations in deportation proceedings." *Perez–Lastor v. INS,* 208 F.3d 773, 778 (9th Cir.2000).

### A. *Due Process Violation*

■■ When the BIA decides an asylum case "based on an independent, adverse, credibility determination, contrary to that reached by the IJ, it must give the petitioner an opportunity to explain any alleged inconsistencies that it raises for the first time." *Campos–Sanchez v. INS,* 164 F.3d 448, 450 (9th Cir.1999). To do otherwise, violates the petitioner's due process rights. *See id.* Here, the IJ did not make a credibility finding. The IJ's decision therefore did not put the Abovians on "notice that [their] credibility was questioned" or that they should provide the BIA with " 'explanations for alleged discrepancies' " in their testimony. *Pal v. INS,* 204 F.3d 935, 938–39 (9th Cir.2000) (quoting *Campos–Sanchez,* 164 F.3d at 449). As a result, the BIA violated the Abovians' rights to due process. We must therefore remand this matter to the BIA so that Abovians will have that opportunity. *See Campos–Sanchez,* 164 F.3d at 450.

■■ Even assuming no due process violation, the BIA's credibility finding is not supported by substantial evidence. To deny asylum on credibility grounds, the BIA must have a "legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief." *Hartooni v. INS,* 21 F.3d 336, 342 (9th Cir.1994). The BIA found Abovian's testimony to be "disjointed, incoherent, and implausible."

■ This circuit has consistently held that an "immigration judge is in the best position to make credibility findings because he sees the witness as the testimony is given." *Id.* The BIA does have "the power to conduct a de novo review of the record, to make its own findings, and independently to determine the legal sufficiency of the evidence." *Ghaly v. INS,* 58 F.3d 1425, 1430 (9th Cir.1995) (quoting *Elnager v. INS,* 930 F.2d 784, 787 (9th Cir.1991)). But the "special deference" accorded to an IJ's credibility determination that is based on firsthand observations of the alien's demeanor and assessments of the tone and tenor of the alien's testimony does not apply to the BIA's independent, adverse credibility determination. *See Singh–Kaur v. INS,* 183 F.3d 1147, 1151 (9th Cir.1999) (citing *Paredes–Urrestarazu v. INS,* 36 F.3d 801, 818–19 (9th Cir.1994)). " 'Rather, we examine the record to see whether substantial evidence supports that conclusion and determine whether the reasoning employed by the [BIA] is fatally flawed.' " *Osorio v. INS,* 99 F.3d 928, 931 (9th Cir.1996) (quoting *Aguilera–Cota v. INS,* 914 F.2d 1375, 1381 (9th Cir.1990)). Any reasons put forth in support of an adverse credibility finding " 'must be substantial and bear a legitimate nexus to the [credibility] finding.' " *Id.* (quoting *Mosa v. Rogers,* 89 F.3d 601, 604 (9th Cir.1996)).

■ As one of two reasons for its adverse credibility finding, the BIA stated that Abovian "did not support his claims with documentary proof or adequately explain his failure to do so." It is well settled in this circuit that independent corroborative evidence is not required from asylum applicants where their testimony is unrefuted. *See Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir.1984). Here, there is no evidence refuting or in any way contradicting Abovian's testimony. A lack of corroborating evidence is certainly not substantial evidence supporting an adverse credibility finding.

■ The second reason the BIA gave in support of its adverse credibility finding was an alleged inconsistency in Abovian's testimony. Specifically, the BIA noted

that "when pressed to testify about specific abuses inflicted by the KGB, the respondent testified that 'there have been physical abuses in my life but I cannot say it's the KGB or not and I don't want to lie'." That particular exchange, however, relates to events in 1974. In later testimony, Abovian consistently stated that, beginning in 1988, he received threatening phone calls from the KGB/NSC and its affiliates, demanding that he work for them as a translator in Turkey, otherwise he would be unable to obtain "a job or a house." It is well established that "inconsistencies of less than substantial importance for which a plausible explanation is offered" cannot form the sole basis for an adverse credibility finding. *Garrovillas v. INS*, 156 F.3d 1010, 1014 (9th Cir.1998); *see also Vilorio–Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir.1988) ("minor inconsistencies" cannot serve as the only basis for adverse credibility finding). What happened to Abovian in 1974 is certainly less important than what has happened to him since 1988, leading up to his departure from Armenia.

The BIA did not find that Abovian lied or misrepresented the facts in his application or testimony. Nor did the BIA point to specific and direct evidence in the record that contradicted Abovian's testimony. Under such circumstances, this court has rejected an adverse credibility finding as unsupported by substantial evidence. *See Aguilera–Cota v. INS*, 914 F.2d at 1382–83. Here, as in *Aguilera–Cota*, there is "a 'total absence of contradictory evidence' in the record as a whole that potentially undermines [the petitioner's] credibility." *Id.* at 1383 (quoting *Damaize–Job v. INS*, 787 F.2d 1332, 1338 (9th Cir.1986)) (alteration in original). The BIA's decision to reject Abovian's assertions as "implausible" appears to be solely a matter of conjecture. *See Lopez–Reyes v. INS*, 79 F.3d 908, 912 (9th Cir. 1996) (stating that "conjecture is not a substitute for substantial evidence"). Without stating "cogent" reasons why it did not believe Abovian, the BIA simply

characterized Abovian's claims as "dramatic" and "implausible." "Non-evidence based assumptions about conduct in the context of other cultures must be closely scrutinized.... 'As a general rule, in considering claims of persecution ... it [is] highly advisable to avoid assumptions regarding the way other societies operate.'" *Chouchkov v. INS*, 220 F.3d 1077, 1083 n. 15 (9th Cir.2000) (quoting *Perez–Alvarez v. INS*, 857 F.2d 23, 24 (1st Cir.1988)).

Additionally, the record suggests that the purported "disjointed[ness]" and "incoherence" in Abovian's testimony "'were possibly the result of mistranslation or miscommunication' [which is] not a sufficient basis for an adverse credibility finding." *Akinmade v. INS*, 196 F.3d 951, 956 (9th Cir.1999) (quoting *Vilorio–Lopez*, 852 F.2d at 1142). For example, at one point the translator admitted to being unable to translate the words Abovian used to explain what had happened to him. *Cf. Perez–Lastor*, 208 F.3d at 777–78 (holding that Perez–Lastor's right to due process at his deportation hearing was violated "because an incompetent translation prevented him from presenting relevant evidence and caused the BIA to find his testimony was not credible").

In sum, the BIA did not give a "legitimate articulable basis to question the petitioner's credibility" or a "specific, cogent reason for [the] stated disbelief." *Hartooni*, 21 F.3d at 342.

**B.** ***Past Persecution On Account of Political Opinion***

Despite the violation of Abovian's due process rights, remand of this matter would not be necessary if the BIA established an "adequate alternative basis" for its decision to deny asylum that is "separate from its adverse credibility finding." *Stoyanov v. INS*, 172 F.3d 731, 734 (9th Cir.1999). "[T]o establish an alternative holding on the merits, the BIA must provide a reasoned analysis of the legal basis for its holding, specifying as well the particular facts on which that holding re-

lies." *Id.* at 736. Here, the BIA's purported alternative basis for denying Abovian's petition was inextricably linked to its adverse credibility finding.

The BIA found that "the harm caused [Abovian] by the NSC did not rise to the level of past persecution and that [Abovian] failed to show that the NSC attempted to recruit him to punish him because of his actual or imputed political opinion or other protected ground." The BIA reached this conclusion, however, strictly on the basis of its rejection of Abovian's testimony. It was not based on a reasoned analysis of the merits of Abovian's claim separate from that testimony. Indeed, there is no indication that the BIA even considered the extensive documentary evidence that Abovian submitted in support of his application that lends some support to his claims.[2] *Cf. Ghaly,* 58 F.3d at 1430 (concluding that an asylum applicant's due process rights were not violated where the BIA clearly considered the documentary evidence contained in the record). Because the analysis behind the BIA's finding that Abovian failed to demonstrate past persecution or a well-founded fear of persecution is based only on Abovian's testimony, it cannot serve as an "adequate alternative basis" for the BIA's decision.

### III. CONCLUSION

For the foregoing reasons, Abovian's petition is granted. The BIA violated the Abovians' rights to due process by making an independent adverse credibility finding

without affording Abovian the opportunity to establish his credibility. Moreover, the BIA's finding that Abovian did not show past persecution because of political opinion is inextricably linked to its adverse credibility finding. It is therefore an inadequate alternative basis for the BIA's decision.

Accordingly, we vacate the BIA's denial of asylum and remand so that Abovian may be provided with a reasonable opportunity to explain the perceived deficiencies in his testimony. If further factual development of record is required, the BIA may need to remand the case to the IJ. We note that on remand the BIA must give sufficient individualized attention to the entire record in this case to ensure the fundamental fairness of the proceedings. If the BIA continues to find Abovian's testimony not credible, "it must provide a legitimate articulable basis for its finding, and 'must offer a specific, cogent reason for any stated disbelief.'" *Stoyanov,* 172 F.3d at 736 (quoting *Osorio,* 99 F.3d at 931). We also note that where an asylum applicant's petition rests largely on his testimony and a translator is used at the hearing before the immigration judge, care must be taken to ensure that an adverse credibility finding is not based on any mistranslations or miscommunications between the applicant and the translator.

The petition for review is GRANTED, the BIA's decision is vacated, and the case is REMANDED to the BIA for further proceedings consistent with this opinion.

---

**2.** For example, the report from the United States Department of State Bureau of Democracy, Human Rights and Labor entitled *Armenia—Profile of Asylum Claims and Country Conditions* (May 1996) ("the Report") states that in the 1990s other Armenians filed asylum claims as "anti-Communists who assert a fear that the present leadership [under Ter–Petrosyan] has not genuinely renounced the Communist past" and will persecute them as a result. The Report also states that such "intimidation has remained for the most part episodic, rather than systematic." Abovian also submitted the Department of State's *Country Reports on Human Rights Practices for 1995 (Armenia),* Report to the House Committee on International Relations and Senate Committee on Foreign Affairs, 104th Cong., 2d Sess. (Joint Comm. Print 1996), Amnesty International's 1996 Report on Armenia, thirteen 1995 and 1996 Armenian newspaper articles, one 1996 Russian newspaper article, and one 1995 Los Angeles Times newspaper article. Each of these documents discusses the human rights abuses perpetuated by the Armenian government and its security forces in the early 1990's against the political enemies of Ter–Petrosyan.

WALLACE, Circuit Judge, dissenting:

The majority reaches out unnecessarily when it decides this case on a constitutional issue the parties never briefed. Its alternate holding fails to follow the Supreme Court's standard of review and erroneously faults the Board of Immigration Appeals' (Board) decision to deny Abovian's asylum petition based on his failure to present sufficient evidence. Accordingly, I dissent.

## I

The majority opinion first holds in one brief paragraph that the Board violated Abovian's due process rights. This will no doubt come as a surprise to the parties in this case, who never raised the issue. Nowhere in Abovian's brief did he even mention the phrase "due process." The Immigration and Naturalization Service was never alerted that we might reach out for the never-raised due process issue and thus was not able to provide us with any argument or analysis on the issue.

Federal courts have a long-standing tradition of declining to rule on disputes in "'the absence of substantial aid from the briefs of either of the parties.'" *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 122, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (Stevens, J., concurring), *quoting Philbrook v. Glodgett,* 421 U.S. 707, 721, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). Indeed, this respect for our adversarial system of justice underlies Article III's case or controversy requirement. *See generally Steel Co.,* 523 U.S. at 121–22, 118 S.Ct. 1003 (Stevens, J., concurring); *Grant v. Johnson,* 15 F.3d 146, 148 (9th Cir.1994).

We have also been instructed repeatedly that even when issues are fully briefed, we should "avoid constitutional issues when resolution of such issues is not necessary for disposition of a case." *In re Snyder,* 472 U.S. 634, 642, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985); *see also United States v. Sandoval–Lopez,* 122 F.3d 797, 802 n. 9 (9th Cir.1997) ("We avoid constitutional questions when an alternative basis for disposing of the case presents itself."). Here, the majority violates this direction when it chooses to decide the constitutional issue before focusing on its alternative reason for granting the petition.

Reaching out for constitutional issues that the parties have not briefed is thus a doubly dangerous undertaking. There is a risk that the court, lacking the analysis ordinarily provided by adversarial parties, will reach the wrong conclusion on the merits and create poor precedent, as the majority opinion aptly demonstrates. Unfortunately, there is the additional problem that constitutionalized errors can only be undone by this court sitting en banc, or by the Supreme Court. It is lamentable that the majority rejects the specific instructions of the Supreme Court:

> Federal courts are courts of limited jurisdiction. They have the authority to adjudicate specific controversies between adverse litigants over which and over whom they have jurisdiction. In the exercise of that authority, they have a duty to decide constitutional questions when necessary to dispose of the litigation before them. But they have an equally strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration.

*County Court of Ulster County, New York v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

## II

The majority correctly points out that we have held the Board to have violated a petitioner's due process rights when it decides an asylum case "based on an independent, adverse, credibility determination, *contrary to that reached by the IJ,*" without giving "the petitioner an opportunity to explain any alleged inconsistencies that it raises for the first time." Maj. Op. at 978 (emphasis added), *quoting Campos–Sanchez v. INS,* 164 F.3d 448, 450 (9th Cir.1999). In this case, however, the

Board's decision cannot possibly be "contrary" to that reached by the immigration judge (IJ) because the IJ never made *any* comment on Abovian's credibility. Without commenting on Abovian's credibility either way, the IJ stated, "The burden of proof is on the applicant for asylum to establish that he is a refugee as defined by Section 101(a)(42)(A) of the Act.... I cannot find that this gentlemen would suffer because of his political views or for any of the other five grounds."

Because the Board's credibility determination was not in conflict with any credibility determination made by the IJ, there could not possibly be a due process issue. The majority makes no attempt to account for this gap in its logic. There is simply no basis for the majority's purported due process violation.

### III

The foundation of the rest of the majority's opinion is Abovian's recitation of the facts, as shown in its "Factual Background." But the Board did not believe Abovian's story. Thus, the majority details its alternate ground for reversing the Board: even if the Board did not violate Abovian's due process rights, there was not substantial evidence to support the Board's adverse credibility determination based on the record before it. In light of the standard of review applicable to this issue, I cannot agree.

As the majority acknowledged, "[s]ubstantial evidence can be found lacking only if the applicant shows that the evidence which he presented 'was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution.'" Maj. Op. at 977–78, *quoting INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The substantial evidence standard is "highly deferential" to the Board. *Marcu v. INS,* 147 F.3d 1078, 1080 (9th Cir.1998). It requires the evidence in Abovian's favor to be so strong that, were this a civil trial, he would be entitled to a judgment as a matter of law.

*NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939), *cited in Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. 812. Because minds differ as to whether Abovian's story was or was not credible, we are obligated to deny Abovian's petition and show the required deference to the Board which was charged with evaluating Abovian's credibility. *See Diaz–Escobar v. INS,* 782 F.2d 1488, 1493 (9th Cir.1986) ("Under the deferential substantial evidence standard, we may not reverse the [Board] simply because we disagree with its evaluation of the facts....").

When the Board reviewed the record, it concluded that Abovian's testimony was "disjointed, incoherent, and implausible." It was. At his hearing before the IJ, Abovian testified that he met face-to-face with Levon Ter–Petrosyan, the President of Armenia, at least "15 to 20 times" in 1993 and that each time they met, President Ter–Petrosyan tried to recruit him into the Armenian National Security Committee (NSC). According to Abovian (and to Armenian opposition groups, Abovian claimed), the Armenian NSC was actually run by the KGB; Armenia was not really independent; and "Levon Ter–Petrosyan [was] the KGB." Abovian's allegations concerning Ter–Petrosyan seem especially implausible considering that Ter–Petrosyan was not a member of the Communist party. Rather, he was the *head* of the Armenian National Movement party, which competes with the Communist party, and was the democratically elected President. *1996 State Department Profile of Armenia.*

Abovian's written application was quite lengthy. In it, however, he made no mention of his allegation that *at least fifteen times in one year* he was taken to a hotel room and asked in person, *by the president of the country,* to join the KGB. The majority may view such inconsistencies between Abovian's declaration and his testimony as ones "of less than substantial importance," but I do not, nor must the

Board. Like the Board, I see this as "a material omission that goes to the heart of the respondent's claim that he was considered an important potential asset to the current Armenian regime." That he failed to mention this in his formal written application raises an additional alert on an already suspicious story.

When the Board examined Abovian's hard-to-believe claims, it rejected them not because it found them lacking corroboration (as asserted by the majority), but because Abovian offered no adequate explanation for his failure to obtain any corroborating evidence. It is important to remember that the rule against requiring supporting evidence in every asylum case applies only (1) when the petitioner's story is credible in the first place, and (2) there is a good reason for the petitioner's failure to provide corroborating evidence of any kind. *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir.1985) (pointing out that the alien's testimony must be "unrefuted and credible").

The majority asserts that the Board erroneously rejected Abovian's testimony solely for failure to provide documentary proof. The Board's decision makes clear that this is not true:

> He made dramatic claims about the current president of Armenia, Mr. Ter–Petrosyan's relationship to the KGB and personal effort to persuade the respondent to join the NSC. An asylum applicant must make an effort to offer corroborative evidence in support of his testimony or, when such evidence is unavailable, provide an explanation for its unavailability. *Matter of S–M–J–, supra.* The respondent did not support his claims with documentary proof *or adequately explain his failure to do so.*

(Emphasis added.) A review of Abovian's testimony before the IJ is illustrative:

> Q. She's only asking if you have any document of any newspaper or any piece of paper that explains that this committee exists. That's all. And the question is, do you?

> A. Not with me right now.... If I knew, I would have brought one.
>
> \* \* \* \* \* \*
>
> Q. Sir, do you have any proof that this organization is linked to the KGB?
>
> A. For sure.
>
> Q. Sir, other than your own testimony that you provided today, do you have any documentary proof that this National Security Committee is linked to the KGB?
>
> A. No. No Proof.
>
> \* \* \* \* \* \*
>
> Q. Sir, you stated that people claim that he [the President of Armenia] is the leader of the KGB now. Do you have any proof that he is such a leader of this organization?
>
> A. He is the leader of Armenia.
>
> Q. Is he connected to the KGB at all?
>
> A. Of course.
>
> Q. Do you have any proof of this today, sir?
>
> A. For me, it's like everyone knows— every Armenian you ask, they'll say the same thing.

Despite the apparent ease which Abovian could have obtained corroboration of his dramatic claims concerning the President of Armenia ("everyone knows"), he presented no documentation and called no relevant witnesses. His only two witnesses, his wife and daughter, both failed to corroborate any of his claims concerning the KGB. In fact, his wife stated that she knew *nothing* of his supposed problems with the KGB until ten days before Abovian himself arrived in the United States. Furthermore, Abovian asserted that he would have brought documentary evidence to his May 22, 1996, hearing had he known it was important. Even looking past the fact that his counsel was obligated to prepare him properly for his hearing and that he offered no valid reason for not bringing evidence with him on that day, Abovian's proceedings were continued twice, from May 22 to August 7, and again from August 7 to November 14. Still, there was no corroboration or explanation for the failure to present it.

Faced with Abovian's incredible stories and his failure to explain why he was unable to present any evidence to support his claims, the Board made a negative credibility determination as an alternate ground for denying his application. Based on the record, this determination was well within the bounds of reason and was unquestionably supported by substantial evidence. Accordingly, I do not feel "compelled" to reverse it. *Singh–Kaur v. INS,* 183 F.3d 1147, 1152–53 (9th Cir.1999) (affirming adverse credibility determination, in part, because of implausibility of alien's testimony).

I wish to emphasize one additional point pertaining to the majority's reversal of the Board's negative credibility determination. Even though we do not give "special deference" to a negative credibility determination from the Board because it does not observe the alien's demeanor and hear his voice as the IJ does, maj. op. at 978, we still must be extremely deferential to it:

> We review credibility findings of an IJ and the [Board] under a substantial evidence standard. That standard is *extremely deferential.* The court *must uphold* the [Board's] findings unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result. . . .

*Singh–Kaur,* 183 F.3d at 1149–50 (internal quotations and citations omitted) (emphasis added). The majority's statement that we do not give "special deference" to the Board's negative credibility determination should not be construed to mean that we give it no deference at all: we must give it extreme deference.

### IV

As an alternative ground, the Board explicitly found that "[e]ven assuming the respondent testified credibly, he has not shown past persecution or a well-founded fear of future persecution from the KGB or NSC." This finding is supported by substantial evidence. To begin with, Abovian clearly admitted at his hearing that he had not been harmed physically at any time after Armenia became an independent country. He also said that he was not even sure that it was the KGB that was responsible for the abuses he suffered prior to the breakup of the Soviet Union.

The only evidence of serious harassment Abovian presented was testimony that his daughter was hit by a car after he refused to join the NSC. Even assuming that the NSC committed such an act, it alone would be insufficient to constitute persecution as defined by the Supreme Court. *See Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812 (a military or paramilitary organization's attempts to coerce a person into performing military service does not, without more, constitute persecution). If the NSC harmed Abovian's daughter, it was not because of his political opinion, but rather for his refusal to join their organization.

The burden was on Abovian to prove his eligibility for asylum. 8 U.S.C. § 1101(a)(42)(A); *see also Singh v. INS,* 134 F.3d 962, 966 (9th Cir.1998). He failed to present evidence that he was persecuted on a protected ground. The IJ rejected his claim on this additional ground and the Board agreed. Because the evidence does not compel reversal, I must dissent on this ground also.