**Werner MONTENEGRO; Aleida Perez, Petitioners,**

**v.**

**John ASHCROFT, Attorney General of the United States, Respondent.**

**No. 02–1904.**

United States Court of Appeals, Third Circuit.

Argued Jan. 13, 2003.

Decided May 16, 2003.

Regis Fernandez (Argued), Newark, New Jersey, for Petitioners.

Alison R. Drucker (Argued), Donald E. Keener, Mark C. Walters, Michael P. Lindemann, William C. Minick, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for Respondent.

Before: SCIRICA, Chief Judge,* BARRY and SMITH, Circuit Judges.

---

* Judge Scirica began his term as Chief Judge on May 4, 2003.

## OPINION OF THE COURT

SCIRICA, Chief Judge.

This appeal concerns an application for asylum by a Guatemalan refugee and his family. The Immigration Judge granted the application but the Board of Immigration Appeals reversed.

### I.

The factual background of this case derives primarily from the testimony of petitioner Werner Montenegro and his son, Jose Montenegro.[1] Over the course of three hearings before the Immigration Judge, the two men testified in Spanish. The transcript subsequently was translated into English. Because of a flawed translation, the transcript reads imprecisely and awkwardly in places, but Immigration Judge Alberto J. Riefkohl, who is fluent in Spanish, found the men's testimony to be credible and persuasive.

Werner Montenegro was born in Guatemala on July 26, 1951. He testified that in 1982, he started working as an agricultural internal auditor at a quasi-public wheat growers association. During this time, Montenegro and others organized a labor union. Management, headed by a man named Carlos Pac, opposed the union.

The labor dispute evolved into a court case, in which the union prevailed. After recounting these labor problems, the IJ stated that "[u]p to [this] point, the analysis of [Montenegro's] problems seemed to be strictly labor-related, and if they had ended right there, in my opinion, Mr. Montenegro would not have a claim rising to the level of asylum."

But Montenegro's problems moved beyond the court battle over the labor dispute. As the IJ found, "Mr. Montenegro claims, and has submitted some documents in support of that, he started receiving threats and phone calls as to his initiatives in forming that particular labor group." Montenegro testified that, following the union's victory in court, the Guatemalan government removed the presiding judge, forced a settlement, and re-installed the prior management.

Following the government's action, Montenegro experienced subsequent "reprisals" against him and his family. As the labor negotiations continued, the reprisals included threatening phone calls from unknown individuals. Montenegro also was threatened physically. He testified that, upon leaving a bus he had taken to a meeting with a labor minister in Guatemala City, he was accosted by "a group of armed people, very, very much armed," who threatened to take "harsh measures" against him if he continued the labor union effort.[2]

According to Montenegro's testimony, the reprisals also touched his family. In 1987, while his wife and daughter, Jessica, were traveling to a place called "Los Encuentros," Montenegro testified that "a group of armed people, private, private, armed people, they detained the whole transport. They threatened my wife and they beat her, and that, and she should tell me that I should stop being involved in things, because it was too much." According to Montenegro, the beating included a strike to his wife's mouth with a rifle butt, which resulted in a cut to her mouth.

---

1. This application also includes, derivatively, the application of Montenegro's wife, Aleida Perez.

2. This portion of Montenegro's testimony exemplifies the transcript's imprecision. As

Montenegro testified, "[W]hen we were traveling to have the meeting with the minister of labor, and we arrived at the office of the labor minister, the (indiscernible) was there (indiscernible). I do not remember the (indiscernible)."

In September 1987, Montenegro was fired from his job at the wheat growers' association. In November 1987, fearful for his family's safety due to threatening phone calls and the presence of suspicious cars constantly near his home, Montenegro and his family fled their Quetzaltenango home in the middle of the night, bound for his parents' home in San Pedro Allampuc. In 1988, Montenegro's home in Quetzaltenango was destroyed by an unknown source.

In December 1987, Montenegro was approached by members of the MLN (National Liberation Movement) Party, who asked him to run for mayor of San Pedro Allampuc. Montenegro accepted the invitation and became a candidate because he believed the mayoral position would provide protection to himself and his family. But his candidacy brought additional threats, and Montenegro withdrew from the campaign.

In 1989, Montenegro fled Guatemala and came to the United States for six months. During that time, Montenegro's wife and children moved to Guatemala City and requested political asylum from the Canadian embassy. But their asylum request was denied because Montenegro was not residing in Guatemala at the time.

Following this denial, Montenegro returned to Guatemala. He testified that he returned because "if something would happen, it would happen to [his entire family]." Montenegro testified that the family hid "deep in houses, deep in addresses" between 1989 and 1991. Then, in 1991, Montenegro testified that his brother-in-law, Mario, was attacked in a case of mistaken identity: "[T]hey, they attacked him, and I imagine that they took him for me, and when they saw that that was a differ-

ent person, that he should tell me and let me know that why he came to Guatemala, that the best thing could be that I should stay out of there." Montenegro testified that Mario needed one month to recuperate from the attack and that Mario had declined to report the incident to the police for fear of retaliation.

Following the attack on his brother-in-law, Montenegro testified that he "took a decision with [his] wife to see how [they] would be able to leave Guatemala whichever way [they] could." As he stated, "We could not risk anymore our lives there." On May 3, 1992, Werner Montenegro entered the United States on a B-2 visa along with his wife, Aleida Perez, and their fourteen year old son, Jose Montenegro.[3] On or about August 30, 1993, Montenegro applied for asylum in the United States. He stated the basis for his application as the need to escape persecution stemming from his involvement with the National Wheat Growers Union in Guatemala.

The Immigration and Naturalization Service denied Montenegro's application for asylum. Montenegro petitioned for review before an immigration judge. On August 14, 1997, the IJ conducted his third and final hearing as to the request for asylum. In addition to the testimony of Werner and Jose Montenegro, the IJ considered multiple documents with regard to the political situation in Guatemala. Among these documents was a State Department report on labor unions in Guatemala. The report, drafted in August 1996 and entitled "Guatemala—Profile of Asylum Claims & Country Conditions," analyzed the political situation for members of a labor union:

---

3. In August 1993, Aleida Perez filed her own application for asylum, in addition to her derivative application under her husband's. On October 24, 1994, Jose Montenegro submitted an independent application for asylum. The Immigration Judge consolidated both of those cases with Werner Montenegro's.

Although the right to organize and bargain collectively is recognized by the Constitution, and 8 percent of the 3–million–member labor force is unionized, claims of mistreatment by labor union members and leaders are frequently received.

During 1995, a number of trade union activists were subjected to threats, assassination attempts, kidnappings, and physical harm. The Archbishop's office reported that unknown assailants killed 2 unionists, injured 5, and threatened 19, although it was not always clear whether such violence was union related.

The secretary general of the public employees federation went into hiding for several weeks after threats on his life. A union organizer was abducted and beaten in May 1995 and the daughter of a health workers union officer was severely beaten in September. Also in September, the secretary of the electrical workers union was kidnapped and held for 18 hours during a strike.

Although many local and international groups charge that unionists have been particular targets of extrajudicial violence, available evidence does not establish a pattern of systematic attacks on unionists by security forces. However, some police and military personnel have intervened at times to help local employers. Labor violence frequently involves thugs hired by employers and others opposed to union activities.

The IJ found the State Department report supported the Montenegros' contention that the authorities "were not willing or capable of intervening."

Based on all of this evidence, the IJ found the Montenegros' testimony to be credible and granted asylum relief to all three family members:

When we put all of this together, it looks to me that Mr. Montenegro has been identified by a group that the government is unwilling or unable to control, and in that sense, I think he deserves the protection that he is seeking before me. . . . I also should point out that I have observed very, very carefully both of the male respondents before me. I find their testimony is sincere and credible. . . . I never observed any attempt to hide facts. . . . I find that, in essence, the whole story presented makes sense, it's corroborated by the State Department to a certain extent, and since I have found them credible, I think that the appropriate thing is to extend benefits to the respondents.

On March 6, 2002, the BIA vacated the IJ's decision in a two-page opinion. Although the BIA stated it was conducting a de novo review of the record, it did not make a credibility finding as to Werner Montenegro's testimony. The BIA stated that "[e]ven if we assume the truth of [Werner Montenegro's] statements . . . [he] has failed to meet his burden of proof." The BIA also declined to address Jose Montenegro's testimony, which corroborated his father's account, and other documentary evidence. Instead, the BIA succinctly found that none "of the foregoing events rise to the level of persecution" and that Montenegro "has not demonstrated a well-founded fear of persecution should he return to Guatemala." Montenegro filed a timely appeal.[4]

## II.

### A.

Montenegro contends he is eligible for asylum under Immigration and Nationality Act § 208(a) (codified at 8 U.S.C.

4. We have jurisdiction to review the final order of the BIA under 8 U.S.C. § 1252(a)(1).

See *Abdulai v. Ashcroft,* 239 F.3d 542, 548–49 (3d Cir.2001).

§ 1158(a)). Under the INA, "an alien physically present in the United States ... may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of § 1101(a)(42)(A) of this title." *Id.* A "refugee" is statutorily defined as an alien who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

We begin by addressing the proper standard of review. In *Abdulai,* we held that, in most cases, we review only the decisions of the BIA and not those of the IJ. 239 F.3d at 548–49. Unless the BIA expressly adopted or deferred to the IJ's opinion, we review only the decision of the BIA. *Id.* Here, the BIA stated clearly that it was conducting a de novo review of the record. Therefore, we review the BIA's decision.

We review the BIA's factual findings concerning eligibility for asylum under a "substantial evidence" standard. As the Supreme Court enunciated in *INS v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), "[t]o reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it." *Id.* at 481 n. 1, 112 S.Ct. 812 (emphasis in original); *see also Abdille v. Ashcroft,* 242 F.3d 477, 483–84 (3d Cir. 2001). The asylum applicant bears the burden of establishing that he or she falls within this statutory definition of "refugee." *Balasubramanrim v. INS,* 143 F.3d 157, 161 (3d Cir.1998) (applicant has burden); 8 C.F.R. § 208.13(a) ("The burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act.").

## B.

As we declared in *Abdulai,* the statutory availability of judicial review "necessarily contemplates something for us to review." 239 F.3d at 555. At issue in this appeal is whether the BIA decision is based on substantial evidence.

After describing Montenegro's testimony, and citing to the record, the BIA made the following determination:

We do not find that any of the foregoing events rise to the level of persecution, even assuming *arguendo* that the respondent's union activities were an expression of his political opinion and aside from whether the foregoing incidents were perpetrated by persons the Guatemalan government was unwilling or unable to control. None of the events that the respondent described as happening to him, even in the aggregate, involved harm that would amount to persecution. There is no evidence that he was detained more than one brief time; he was not physically harmed but only vaguely threatened. The ambiguous telephone calls he received likewise do not amount to persecution. Regarding his wife's incident—aside from whether it was directed at respondent himself—it too fails to rise to the level of persecution.

As the Supreme Court has declared, we must uphold the BIA's determination if it was "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Elias–Zacarias,* 502 U.S. at 481. To review the BIA's decision, therefore, we must be able to find reasonable, substantial, and probative evidence to support its conclusion.

The BIA's conclusion here is not supported by the record. The Montenegros' uncontroverted testimony is that Werner Montenegro, his wife, and his brother-in-law were attacked and threatened on three separate occasions; the family's home in

Quetzaltenango was destroyed; and they regularly received threatening phone calls and witnessed suspicious cars driving by their home. Evidence demonstrating multiple physical attacks, the destruction of a home, and threatening phone calls and surveillance qualifies as "persecution" under applicable precedent. *In re Acosta,* 19 I & N Dec. 211, 1985 WL 56042 (B.I.A.1985).

The attack on Mrs. Montenegro is especially troubling. According to the hearing transcript, Montenegro's wife was threatened, attacked, and beaten in the presence of their young daughter. The threats directly related to Montenegro's participation in labor union efforts. And the attack included a blow to Mrs. Montenegro's mouth with a rifle butt.

In addition to his own testimony, Montenegro introduced corroborative evidence, including a United States State Department report and letters from family members in Guatemala warning him to stay away. And Montenegro's son, Jose, offered corroborating testimony. The BIA did not refer to this evidence in its opinion.

The BIA stated that "[n]one of the events that the respondent described as happening to him, even in the aggregate, involved harm that would amount to persecution" and described Montenegro's evidence as "vague." *Id.* In defining persecution, the BIA cited to three cases. *Fatin v. INS,* 12 F.3d 1233, 1240 (3d Cir.1993) (persecution does not encompass all unfair or unjust treatment); *In re A–E–M,* 21 I & N Dec. 1157, 1159, 1998 WL 99555 (B.I.A.1998) (a single, unattributed, nonviolent act is not persecution); *In re Ka-*

*singa,* 21 I & N Dec. 357, 365, 1996 WL 379826 (B.I.A.1997) (analyzing a well-founded fear of future persecution). But all of these cases are distinguishable. In *Fatin,* the alien had not suffered past persecution and was attempting to prove a well-founded fear of future persecution. Our holding rested on our decision that the alleged persecution was not "on account of" the alien's involvement in a social group. 12 F.3d at 1240. In *Kasinga,* the alien alleged a future threat of female genital mutilation if she was deported to her home country of Nigeria. She did not allege past persecution. Moreover, in *A–E–M,* the alien's testimony was confined to a single threat, that "at some point, a painted phrase appeared on the exterior of his house indicating that he would be "the next one"; he "assumed" the Shining Path group was responsible for this threat but he had nothing more on which to rely. *A–E–M,* 21 I & N Dec. 1157, at *3.

Here, the BIA's determination was conclusory and without connection to reasonable, substantial, and probative evidence on the record considered as a whole.[5] We find the record clearly demonstrates Montenegro has produced substantial evidence of past persecution on account of his union activities.

### III.

To establish eligibility for asylum, the alien must present evidence that his alleged persecutors want to punish him "on account of race, religion, nationality, membership in a particular social group, or

---

5. *See Abovian v. INS,* 234 F.3d 492 (9th Cir. 2000). The BIA, in its opinion, rejected the applicant's request for asylum because it was "disjointed, incoherent, and implausible." *Abovian v. I.N.S.,* 219 F.3d 972, 978 (9th Cir.2000). The Ninth Circuit vacated the BIA's decision and remanded for further proceedings, declaring the BIA's holding was "solely a matter of conjecture." *Id.* at 979;

*see Lopez–Reyes v. INS,* 79 F.3d 908, 912 (9th Cir.1996) (stating that "conjecture is not a substitute for substantial evidence"). The court directed that "the BIA must provide a reasoned analysis of the legal basis for its holding, specifying as well the particular facts on which that holding relies." *Abovian,* 219 F.3d at 979.

political opinion." 8 U.S.C. § 1101(a)(42)(A). To establish a "well-founded fear of persecution," the alien must demonstrate both a subjectively genuine fear of persecution and an objectively reasonable possibility of persecution. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 430–31, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The subjective prong requires a showing that the alien's fear is genuine. The objective prong requires a determination whether a reasonable person in the alien's circumstances would fear persecution if returned to his home country.

Where an alien demonstrates past persecution, he is presumed to have a well-founded fear of persecution. *Abdille*, 242 F.3d at 496; 8 C.F.R. § 208.13(b)(1) ("An applicant who has been found to have established such past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim."). The INS may rebut this presumption by demonstrating the applicant experienced a "fundamental change in circumstances" or that he could avoid persecution by relocating to another part of his home country. 8 C.F.R. § 208.13(b)(1)(i)(A)-(B).

Here, the INS has not submitted evidence to rebut the presumption. Montenegro's showing of past persecution on account of his union activities, therefore, properly establishes his eligibility for asylum relief.

### IV.

We will grant the petition for review, vacate the BIA's order, and remand to the

BIA with direction to remand to the IJ to grant the application for asylum.[6]

---

**6.** During the course of these proceedings, Jose Montenegro has bypassed his 21st birthday and thus can no longer be considered derivatively to his father's application for asylum. Still we urge the Attorney General exercise his discretion to grant Jose Montenegro's separate application for asylum given thie circumstances surrounding the application before us.