Soghomon ABOVIAN; Lousine
Abovian; Iskoui Abovian,
Petitioners,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 98–70934.

United States Court of Appeals,
Ninth Circuit.

Order Filed July 20, 2001

Order Filed July 5, 2001

Before: WALLACE, PREGERSON
and THOMAS, Circuit Judges.

## ORDER

The order denying rehearing filed July 5, 2001 and the dissent are designated for publication.

## ORDER

A sua sponte call for en banc was made by a member of the Court.

The full court was advised of the call on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R.App. P. 35(b).

The brief filed by respondent urging en banc is denied and the petition for rehearing en banc is rejected.

KOZINSKI, Circuit Judge, with whom Circuit Judges O'SCANNLAIN, TROTT, T.G. NELSON, KLEINFELD, GRABER, RICHARD C. TALLMAN and RAWLINSON join, dissenting from the order denying the petition for rehearing en banc:

The majority overthrows a perfectly reasonable BIA decision by invoking novel rules divorced from administrative law, Supreme Court precedent and common sense. While this is a particularly egregious case, it is not the first one where we have whittled away the authority and discretion of immigration judges and the BIA, imposing ever more stringent standards on how these adjudicatory officers must perform their functions. What the majority does here is the antithesis of administrative deference.

The majority doesn't defer to the Supreme Court either. While reciting that we may only reverse the BIA if petitioner has presented evidence "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution," the majority reverses based on a story so wild, implausible and uncorroborated that no reasonable factfinder could believe it.[1] *Abovian v. INS,* 219 F.3d 972, 977–78 (9th Cir.2000) (quoting *INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). The majority effectively inverts the standard by saddling the BIA with the burden of proving that petitioner is *not* entitled to relief.

Abovian testified that Levon Ter–Petrosyan, who then was the President of Armenia, had met with him in a hotel more than fifteen times to recruit him for service in the KGB. He made no mention of such extraordinary interviews in his written

1. The Supreme Court recently reminded us that it's not enough to recite the correct legal standard; we must actually apply it. *See Major League Baseball Players Ass'n v. Garvey,* — U.S. —, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) (per curiam) ("To be sure, the Court of Appeals here recited these principles, but its application of them is nothing short of baffling.").

asylum application. Nor did he try to reconcile his story with our State Department's Country Report for Armenia, which observes that Ter–Petrosyan led his country to independence from the Soviet Union and is a political adversary of the Communists. *See* U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor, Armenia–Profile of Asylum Claims & Country Conditions 6 (May 1996) ("Country Report"). Although Abovian testified that "everybody knows" that independence is a fiction and that Ter–Petrosyan works for the Russians, he presented no affidavits, letters or articles in support. A.R. 160. In fact, Abovian presented nothing but his own testimony to document this fantastic claim. His wife and daughter testified, yet neither corroborated his story.

Abovian's testimony was marked by internal inconsistencies and material departures from his asylum application. He testified he was beaten when he went to Cuba, then said that he was jailed as a traitor because he refused to go there. He wrote that the KGB tried to coerce his assistance by placing him in a small hole in the ground filled with water and snakes, but later admitted he couldn't be sure it was the KGB that had abused him. He wrote that the KGB restricted him to menial labor jobs, but later said he had been in demand for his expertise in the air conditioning business. He wrote that his daughter had been struck by a car and could not identify the driver until twelve days after the accident, but later testified that she did so after only two days. While Abovian described his daughter as completely paralyzed in his application, she testified that only half her body had been paralyzed. He testified that the KGB kidnapped his daughter and warned him not to tell the police, even though he also testified that the KGB ran the country. *See* n. 5 *infra.*

The BIA found Abovian's testimony "disjointed, incoherent, and implausible." It faulted him for his inconsistencies; his failure to produce any supporting documents or explain why he couldn't; his failure to mention the Armenian President in his application; and the general implausibility of the whole tale. Despite these problems with Abovian's story, the majority sets aside the BIA ruling for four reasons, none of which can be found in the immigration laws or regulations, or for that matter in any caselaw outside this circuit: the BIA violated Abovian's due process rights by failing to give him a chance to clean up his story; the BIA erred by holding Abovian's failure to provide corroborating evidence against him; the BIA erred by concluding that Abovian's numerous inconsistencies cast doubt on his credibility; and the BIA erred by taking into account the general implausibility of his tale.

As Judge Wallace notes in his lucid dissent, the majority's due process ruling is especially curious because Abovian himself never raised it. The majority could have avoided this constitutional issue because Abovian waived it, or because the majority throws out the BIA's decision on another ground. But the majority instead chooses to ignore well-established principles of judicial restraint and holds that Abovian's hearing was fundamentally unfair, because the BIA decided to disbelieve his testimony, without first giving him a chance to explain away inconsistencies and supplement the record. *See Abovian*, 219 F.3d at 980 (BIA must give Abovian "a reasonable opportunity to explain the perceived deficiencies in his testimony" and remand the case to the IJ "[i]f further factual development of [the] record is required.").

This constitutional rule exists nowhere outside the Ninth Circuit. The majority contends that the BIA violated Abovian's right to a fair hearing, but what kind of

unfairness can there be when the BIA uses the petitioner's own words against him? A petitioner who testifies, like any other witness, puts his credibility at issue. *See, e.g., Stewart v. United States,* 366 U.S. 1, 6 n. 13, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961) ("[T]he defendant's credibility is in issue whenever he testifies."); *United States v. West,* 826 F.2d 909, 912 (9th Cir.1987) (same). Abovian and his lawyer knew that, by taking the stand, petitioner would risk being faulted for inconsistencies in his testimony, implausible failures of memory, hesitations and omissions. Counsel for the INS was entitled to probe for such weaknesses through cross-examination, and petitioner's counsel could try to rehabilitate him on redirect. If the IJ had then chosen to disbelieve petitioner, he would have had no constitutional right to get back on the stand and patch up his story.

The result should be no different when it is the BIA that makes the adverse credibility determination. Congress gave the BIA authority to "conduct a de novo review of the record, to make its own findings, and to determine independently the sufficiency of the evidence." *Castillo v. INS,* 951 F.2d 1117, 1120–21 (9th Cir.1991) (emphasis omitted). The BIA may disregard the IJ's credibility judgment and, should it do so, we review only the BIA's decision, not that of the IJ. *See Pal v. INS,* 204 F.3d 935, 937 n. 2 (9th Cir.2000). Petitioner had ample notice of the BIA's authority, and he had a full opportunity to develop the record. Moreover, he was well aware that his credibility was in doubt because counsel for the INS challenged his

story on cross-examination before the IJ. *See* A.R. 158–61.[2] How then can Abovian complain that the BIA deprived him of his right to a fair hearing by faulting him for inconsistencies in the record? He can't and he didn't; the majority does it for him.

The majority's second reason for reversing the BIA also has no support in the immigration laws and pushes our court even further adrift from the law of other circuits. The majority holds that the BIA cannot fault a petitioner for inexplicably failing to corroborate his story with documents or other evidence one might expect him to have available. Because asylum petitioners have the burden of proving they are entitled to relief, *see Meza–Manay v. INS,* 139 F.3d 759, 763 (9th Cir. 1998), it's entirely appropriate for the trier of fact to expect the petitioner to gather such proof as is available, or explain why it's not. A petitioner's failure to do one or the other strikes me as a perfectly legitimate (and sensible) reason for rejecting his story.

The BIA has endorsed this approach and held that corroborating evidence will not be necessary where impossible to provide, but "where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided." *In re S–M–J,* Int. Dec. 3303, 1997 WL 80984, at 5 (BIA Jan. 31, 1997) (en banc). Because federal courts must defer to the BIA's reasonable interpretation of immigration law, the two other circuits that have passed on this issue have endorsed this rule and held that the BIA

2. The IJ also expressed skepticism with Abovian's story, asking him questions at various points of his testimony that gave petitioner further notice, if any more was needed, that his story was not being taken at face value. *See* A.R. 134 (IJ: "[B]ut the question is, why is [it] that they are interested in you? Is it because of your father or is it because you say you speak Arabic?"); *id.* at 137 (IJ: "Sir, why

would the KGB care whether you told the police or not if the KGB are in control?"); *id.* at 142 (IJ: "But, since the day that-we're pretending that Armenia became a country, were you ever physically interfered with [in] any anyway?"); *id.* at 155 (IJ: "And [President of Syria] Hafez al-Assad worked for the KGB?"); *see also* n. 5 *infra.*

might reasonably question why a petitioner giving apparently credible testimony would fail to produce evidence that should have been available. *See Abdulai v. Ashcroft,* 239 F.3d 542, 554 (3d Cir.2001) ("[T]he BIA may sometimes require otherwise-credible applicants to supply corroborating evidence in order to meet their burden of proof."); *Diallo v. INS,* 232 F.3d 279, 285 (2d Cir.2000) ("[E]vidence corroborating his story, or an explanation for its absence, may be required where it would be reasonably expected.").

In conflict with these circuits, we have rejected the BIA's interpretation of the governing regulation and held that, where a petitioner gives credible testimony, the BIA may not deny him relief because he failed to produce corroboration. *See Ladha v. INS,* 215 F.3d 889, 899 (9th Cir. 2000). Our interpretation conflicts with the regulation, which provides that the "testimony of the applicant, if credible, *may* be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a) (emphasis added). Nevertheless, we have held that if the BIA cannot find a reason to reject petitioner's testimony, the testimony alone *must* be sufficient to sustain his burden of proof. As the Second Circuit recognized, our rule "renders corroborating evidence unnecessary" and "run[s] contrary to the permissive language of the applicable INS regulations." *Diallo,* 232 F.3d at 286.

While our past cases put us on the wrong side of this circuit conflict, the majority takes our law one step farther and holds that the BIA can't consider the fact that petitioner has failed to present corroborating evidence even in deciding whether to believe him. Abovian claimed that everyone in Armenia knew the president was a KGB stooge, yet he didn't present a single newspaper article or human rights report that supported that claim. Although Abovian testified that "every Armenian you ask, they'll say the same thing," A.R. 160, his own wife and daughter did not corroborate this "fact." Surely, there are other Armenian immigrants in this country, yet Abovian didn't call any of them to testify, nor did he present any affidavits. Abovian testified that his daughter was hospitalized for twenty days after being hit by a KGB car, yet he offered no hospital records.[3] His daughter testified that she was knocked unconscious, was paralyzed in half her body and spent three weeks in the hospital yet, less than three years later, she could show no scars or other visible signs of injury. *See* A.R. 167–68. Abovian testified that he reported the accident to the police, yet produced no police report.[4] He testified that his daughter was kidnapped for eighteen days and that he also reported this incident to the police, but again offered no police record of the incident.[5]

---

**3.** When asked if she had the records, Abovian's daughter testified, "I have papers. I don't know if they're with me or I left them there." A.R. 173. After the testimony, the IJ twice continued the proceedings so that Abovian could present the opinion of the State Department and seventeen other documents describing conditions in Armenia. *See* pp. 9142–44 *infra.* However, he never presented his daughter's hospital records, nor did he explain why he was unable to produce them in the more than nine months between her testimony and the IJ's decision. *See also* n. 7 *infra.*

**4.** We don't know how difficult it would be for Abovian to have obtained such a police report or to have sent for it after he left Armenia. But the asylum petitioner bears the burden of proof, and if he is unable to provide foreign government records, he has the duty to credibly explain why they were unavailable.

**5.** The IJ's frustration with the slipperiness of Abovian's story is evident from his reaction to Abovian's description of the kidnapping. Abovian testified that he immediately reported the incident to the police, but then said that the KGB, which he alleges ran the coun-

Shortly before the IJ made his decision, petitioner submitted an amended application with an Amnesty International report, a State Department human rights report and fifteen newspaper articles documenting human rights abuses and political turmoil in Armenia. Amnesty International reports that eighteen political prisoners faced criminal proceedings falling short of international standards, and lawyers, opposition journalists and religious minorities were beaten by people linked to the government. *See* A.R. 282 (reprinting Amnesty Int'l, Armenia, Report 1996, at 78). The State Department also reports that "[s]ome members of the security forces committed serious human rights abuses," and that the Armenian Government had suspended an opposition political party, the Armenian Revolutionary Federation. A.R. 288 (reprinting U.S. Dep't of State, Armenia Human Rights Practices, 1995). Neither report suggests that the Russian KGB has infiltrated the highest levels of the Armenian Government, or that President Ter–Petrosyan engages in violent recruitment efforts on behalf of the KGB.

These reports do suggest that the Government of Armenia, like many other governments in the world, occasionally resorts to force in order to preserve its hold on power. But, under our law, a petitioner must do more than show that his home country is generally repressive in order to merit asylum; he must show that *he* was the object of oppression on account of the enumerated grounds. *See Prasad v. INS,*

47 F.3d 336, 340 (9th Cir.1995) ("Particularized individual persecution, not merely conditions of discrimination in the country of origin, must be shown before asylum will be granted."); *see also Safaie v. INS,* 25 F.3d 636, 640 (8th Cir.1994) (asylum petitioner "cannot merely contend that the government's policies are repressive or that she disagrees with the policies; she must demonstrate that she fears particularized persecution directed at her...."); *Huaman–Cornelio v. BIA,* 979 F.2d 995, 1000 (4th Cir.1992) (asylum is not available "to anyone who fears the general danger that inevitably accompanies political ferment and factional strife").

Fourteen of the fifteen newspaper articles describe repressive measures the Armenian Government has taken against political opponents. Three articles concern the Armenian Government's alleged persecution of members of the Armenian Revolutionary Front. *See* A.R. 339–45. Eleven concern the political tumult that followed the September 1996 parliamentary elections, which were allegedly rigged by the government. *See* A.R. 298–333. In ensuing political demonstrations, opposition demonstrators stormed Parliament and assaulted legislators, and the police fired into the crowd. The government prohibited demonstrations and arrested several opposition politicians. But Abovian does not claim to be a member of any of these opposition parties, so the stories don't help his asylum claim. In fact, these events all happened after he left the country on Feb-

---

try, had warned him against going to the police:

Abovian: They said ... [i]f you tell the police and all these things, you'll never see your daughter again.

IJ: Sir, why would the KGB care whether you told the police or not if the KGB are in control?

Abovian: Because if I tell the police, the neighbors will know and the word will spread

and they don't want that. They don't want the people to know.

IJ: But you told me that the KGB is in control. If the KGB is in control, what do they care? Are the people in control or the KGB?

Abovian: They have the power but they don't want the people to—... Even the killer doesn't want us to know that he's a killer.

IJ: I see.

A.R. 137–38.

ruary 17, 1994. The only article that even mentions the KGB is an editorial from a Russian newspaper arguing that the Russian internal security service employs tactics reminiscent of the KGB. *See* A.R. 335–37. The editorial does not allege that the service is active in Armenia or any other foreign country. So it in no way helps Abovian's claim.[6]

The majority holds that the total absence of corroborating evidence is irrelevant to whether petitioner's story is believable.[7] The only time the BIA may fault a petitioner for the absence of corroboration is where the INS already has "evidence refuting or in any way contradicting [his] testimony." *Abovian,* 219 F.3d at 978.[8] The majority's rule relieves petitioner of any burden of proving his story and saddles the INS with the burden of *dis* proof. This conflicts directly with the Supreme Court's admonition in *Elias–Zacarias* that we may reverse the BIA's denial of asylum only where the petitioner presents evidence "so compelling that no reasonable fact finder could fail to find the requisite fear of persecution." 502 U.S. at 483–84, 112 S.Ct. 812.

It also puts the INS in an impossible position. The specific facts supporting a petitioner's asylum claim—when, where, why and by whom he was allegedly persecuted—are peculiarly within the petitioner's grasp. By definition, they will have happened at some time in the past—often many years ago—in a foreign country. In order for the INS to present evidence "refuting or in any way contradicting" petitioner's testimony, it would have to conduct a costly and often fruitless investigation abroad, trying to prove a negative—that the incidents petitioner alleges did not happen. The task is made even more difficult if (as we have held) the INS is barred from casting doubt on petitioner's story because it is inconsistent with the State Department Country Report, *see* p. 979 *infra,* or if (as we have also held)

---

**6.** Abovian did produce a 1962 medical record documenting depression, headaches and irritability, illnesses which he attributes to troubles experienced while in the Soviet Army. That record hardly corroborates his story of persecution by a putatively independent Armenia thirty years later.

**7.** The majority vaguely suggests that Abovian has an excuse for failing to provide corroborative documents because he claims he was searched on his departure from Armenia. *See Abovian,* 219 F.3d at 977. But the BIA was not required to accept that explanation, particularly in the teeth of the State Department Country Report, which lists various documents Armenians should be able to take with them. *See* Country Report, p. 9137 *supra,* at 12. Indeed, Abovian managed to present some documents at the hearing, *see* n. 6 *supra,* which he claims to have sent out with his mother prior to his own departure. Even were the BIA to accept his explanation as to why he didn't bring out any documents himself, nowhere does he explain why such documents were not sent out with his mother, wife or daughter—who all left Armenia at different times. Indeed, when the daughter testified, she said nothing about being unable to take documents such as her hospital records out of the country and thought she might well have done so. *See* n. 3 *supra.* Nor does Abovian explain why his remaining family in Armenia could not obtain and send out the documents—such as his daughter's hospital records—by mail. Petitioner, it will be recalled, has the burden, which includes the burden of showing that he could not provide corroboration where he would otherwise be expected to do so.

**8.** While the majority claims "there is no evidence refuting or in any way contradicting Abovian's testimony," *Abovian,* 219 F.3d at 978, the State Department Country Report for Armenia describes President Ter–Petrosyan as a political opponent of the Communists who led his country to independence from the Soviet Union. *See* Country Report, p. 9137 *supra,* at 6. This *does* contradict petitioner's claim that Ter–Petrosyan is nothing more than a KGB puppet, but may not be considered under another one of our special rules. *See* p. 979 *infra.*

petitioner is free to present significant facts at the asylum hearing that were not alluded to in his application, *see* pp. 978–79 *infra.* I find it hard to accept that, in passing the asylum statute, Congress meant for the BIA to believe every applicant's story, no matter how wild and implausible, unless the INS chases all over the world and finds contrary evidence.

The majority opinion eliminates all incentive for a petitioner in our circuit to present corroboration, because anything he presents in addition to his own testimony could give the INS grounds for disbelieving him. *See, e.g., Akinmade v. INS,* 196 F.3d 951, 955 (9th Cir.1999). Far better for him to present nothing but his own testimony. So long as he can craft a story, plausible or not, *see* p. 979 *infra,* the BIA will be barred from holding it against him that he did not present witnesses, documents or other corroborating evidence, even where such evidence should be readily available to him. A rule of law that encourages parties to withhold relevant evidence is unwise. That this rule conflicts with the immigration regulations and requires us to break with other circuits makes it indefensible.

While, with the corroboration rule, the majority prohibits the BIA from faulting petitioner for what he does not present, with its third rule, it blocks the BIA from faulting him for what he does present. Under this rule, the BIA may not doubt a petitioner on the basis of inconsistencies that concern matters of "less than substantial" importance. *Abovian,* 219 F.3d at 979. As we have said in the past, "[m]inor inconsistencies in the record such as discrepancies in dates which reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding." *Vilorio–Lopez v. INS,* 852 F.2d 1137, 1142 (9th Cir. 1988). Like the rule about corroborating evidence, this is another evidentiary rule

that has no ready analogue outside the immigration context.

We have justified our materiality requirement on the ground that minor inconsistencies raise no suspicions because there is no reason a petitioner " 'would intentionally have provided incorrect information on such trivial points.' " *Shah v. INS,* 220 F.3d 1062, 1068 (9th Cir.2000) (quoting *Damaize–Job v. INS,* 787 F.2d 1332, 1337 (9th Cir.1986)). But the trier of fact doesn't deny relief because it believes the petitioner made up only the minor details. Rather, inadvertent contradictions as to details can give rise to the suspicion that the petitioner made up the whole story, and the minor inconsistencies reflect the difficulty in telling a good lie.

Details are the stuff of effective cross-examination. After a petitioner testifies on direct, opposing counsel tries to shake his story by asking him to recall specifics. Petitioner's counsel can't object to such questions as irrelevant. That's because cross-examining a witness on the finer details is a time-honored way of testing the veracity of the critical points of his testimony. While anyone can invent a story to support an asylum claim, cross-examination forces the witness to describe small details that someone would know right away from being there, but that a liar might stumble over when put on the spot.

Because a witness will never testify exactly the same way twice, certain inconsistencies may reveal merely the limits of memory. In immigration cases, inconsistencies might also arise because the petitioner had trouble understanding English or because the translator made a mistake. But while such inconsistencies may be innocent, they may also signal that the petitioner is telling a tale. When a petitioner fails to recall how he was tortured, when he mixes up the chronology of events, or when he embellishes his story with new details, the trier of fact may reasonably

infer that the petitioner is fibbing. Ultimately, it falls to immigration judges and the BIA to sort out whether those inconsistencies are innocent or not; our job does not include making credibility judgments.

Our opinions make liberal use of this materiality requirement to upset credibility determinations with which we disagree. In numerous cases, we have applied this rule to substitute our own reading of the facts for those of the BIA:

- In *Vilorio–Lopez*, petitioner and his cousin testified that they had fled from a right-wing death squad and taken shelter before fleeing to America. *See* 852 F.2d at 1142. Petitioner testified that the incident happened the previous year, yet his cousin testified it had happened three years before. *See id.* at 1143. In petitioner's account, they hid for one hour, but his cousin said they hid for an entire night and the following day. *See id.* We concluded that, because such discrepancies merely concerned issues of timing, they said nothing about whether the two were making up the story.
- In *Garrovillas v. INS*, 156 F.3d 1010, 1013–14 (9th Cir.1998), petitioner stated in his application that vengeful guerrillas

had shot at him, but he later testified that he had never been shot at. When asked to explain the discrepancy, he said he had never actually read his application. We concluded that the BIA could not fault petitioner for such a minor inconsistency.

- In *Bandari v. INS*, 227 F.3d 1160 (9th Cir.2000), petitioner wrote in his application that an Iranian judge sentenced him to 75 lashes, yet he testified that the police summarily whipped him 75 times right after his arrest. *See id.* at 1165. He testified on direct that the police whipped him on the street, yet he testified on cross that the beating took place in the police station. We concluded that these discrepancies were too minor because where he was whipped didn't matter, as though the fact that petitioner couldn't keep the details straight had no bearing on whether the beatings ever took place at all.[9]

In this case, Abovian wrote a lengthy application where he described the KGB's persistent efforts to recruit him, but he failed to mention that this included more than fifteen meetings with the President of Armenia who personally entreated him to join the KGB.[10] Abovian recalled this part

---

**9.** These cases are but the tip of the iceberg, as we have set aside credibility judgments in dozens of others. Moreover, we are the only circuit to do so routinely, which makes life very difficult for the INS because we hear considerably more than our share of asylum appeals. A Westlaw search of immigration cases decided since January 1, 1998, turns up forty-three cases where we have reversed adverse credibility determinations, roughly twenty-three percent of the cases where credibility was at issue. Over that same period, all the other circuits combined have set aside credibility judgments in only four cases, for a reversal rate of about six percent. *See Alvarado–Carillo v. INS*, 251 F.3d 44 (2d Cir.2001); *Zubair v. INS*, No. 99–1034, 1999 WL 569024 (7th Cir. July 30, 1999) (unpublished); *Senathirajah v. INS*, 157 F.3d 210 (3d Cir.1998); *Balasubramanrim v. INS*, 143 F.3d 157 (3d

Cir.1998). The Fifth Circuit has gone even farther and held that a credibility determination is a factual matter not meaningfully susceptible to appellate review. *See Chun v. INS*, 40 F.3d 76, 78 (5th Cir.1994) ("We will not review decisions turning purely on the immigration judge's assessment of the alien petitioner's credibility." (internal quotation marks omitted)).

**10.** The reasons Abovian gave as to why the president of his country was so eager for one particular individual to join the KGB are themselves quite peculiar. Apparently, one of them was that Abovian speaks Turkish. *See* A.R. 136 ("He told me that you speak fluent Turkish. You know the Turkish songs, the words. Everything .... you can be beneficial to us if you go to Turkey."). It is hard to believe that fluency in Turkish is particularly

of his story only after taking the stand, but the majority regards this omission on the asylum application as not worth mention. *But see Abovian,* 219 F.3d at 982–83 (Wallace, J., dissenting) (agreeing with the BIA which recognized this as a "material omission that goes to the heart of the respondent's claim" (internal quotation marks omitted)). Abovian's story also contained contradictory details about whether the KGB had ever physically abused him; about his employment history in Armenia; and about the nature and duration of his daughter's injuries.[11] The majority dismisses these as involving matters that were merely incidental to his asylum claim. But a case like this—where the *only* evidence petitioner presents is his own testimony—turns entirely on petitioner's sincerity. There can be nothing more relevant than whether he sticks to one story.

Lastly, the majority concludes that the plausibility of Abovian's tale has no bearing on the BIA's evaluation of his credibility. In the majority's view, the BIA cannot count the implausibility of Abovian's story against him, because such a judgment is "solely a matter of conjecture." *Abovian,* 219 F.3d at 979. What the majority calls "conjecture," others would call common sense. Whether to credit the testimony of a witness always involves some uncertainty, yet we must constantly make decisions without full information. We often rely on common sense—our understanding of how the world works—to fill the gap. When you meet a man on the Brooklyn Bridge, you are much more likely to believe that he owns the clothes on his back than the bridge on which you are standing. The majority bars the BIA from drawing precisely this kind of inference when a petitioner testifies that the elected president of a foreign country is, in fact, a spy for the Russians.

We defer to the BIA in part because of its experience in hearing claims involving the conditions in foreign countries. *See Sanon v. INS,* 52 F.3d 648, 651 (7th Cir. 1995). In addition, the BIA may look to the State Department Country Report, "which has been described as 'the most appropriate and perhaps the best resource' for 'information on political situations in foreign nations.'" *Kazlauskas v. INS,* 46 F.3d 902, 906 (9th Cir.1995) (quoting *Rojas v. INS,* 937 F.2d 186, 190 n.1 (5th Cir. 1991)). By concluding that the BIA cannot take into account the plausibility of petitioner's tale, we prevent it from relying on its own experience and that of the State Department in evaluating petitioner's story. I can see no reason for such a rule except that, once again, it forces the BIA and the IJ to accept petitioner's testimony by foreclosing one of the traditional reasons for doubting him.

When taken together, these four rules take the asylum decision from the BIA and put it in the hands of our court. Except in the rare case where the petitioner breaks down under cross-examination and admits that his story is fabricated, there will be nothing the BIA or the IJ can do to insulate its exercise of discretion from reversal

---

rare among the residents of a country situated next door to Turkey.

**11.** Abovian also claimed he knew a KGB agent had driven the car that hit his daughter, because she was able to identify the driver. While Abovian's daughter could give few details as to the accident because of loss of memory, she testified she did remember very clearly who was driving the car. But she also testified that the accident took place at night and it was dark outside. In judging her credibility, the BIA may have wondered about her selective recollection or how she could have seen who was driving the car that was heading right at her. If the headlights were on, they would have blinded her, and if they weren't on, it would have been too dark to see the driver.

by our court. The petitioner will be entitled to spin a tale that bears no resemblance to reality, and his most implausible explanations have to be accepted. If the IJ does not believe petitioner's story, the judge must give cogent reasons, which cannot include internal inconsistencies, lack of corroboration, his failure to raise important points in his petition, the fact that his story contradicts the State Department Country Report or that it is otherwise wholly implausible. One might wonder what those cogent reasons might possibly be that the IJ can offer for disbelieving a petitioner's story.

If the IJ decides there's no point trying to make an adverse credibility determination because it won't be upheld by our court, petitioner's story is treated as the truth and must be deemed sufficient to carry his burden. If the BIA decides to be bolder and makes an adverse credibility determination, where the IJ didn't, we hit it with a double-whammy: First, they can't find petitioner to be lying unless and until they give him a chance to plug up any holes the BIA may have found. And, second, it doesn't matter anyway, because there really are no reasons cogent enough to support an adverse credibility determination, and absent such cogent reasons, petitioner's testimony must be accepted as sufficient to support his asylum petition. *See Aguilera–Cota v. INS,* 914 F.2d 1375, 1383 (9th Cir.1990) ("[W]e presume that if the IJ had any additional reasons to doubt [petitioner's] credibility, the IJ would have stated so in the decision below." (internal citation omitted)).

So it is unclear why the majority chooses to send this case back to the BIA, rather than grant Abovian asylum outright. What, precisely, could happen on remand? The BIA is supposed to give Abovian another chance to testify, but petitioner has absolutely no reason for doing so, in view of the majority opinion which

holds that there is no plausible reason for disbelieving his story: His inconsistencies are not enough; his lack of corroboration is not enough; the utter implausibility of his story is not enough; the inconsistency with the State Department Country Report is not enough. By reopening his case, Abovian can only shoot himself in the foot as the BIA might seize on any new evidence he presents as grounds for making a renewed adverse credibility determination. Abovian would be a fool to run back to third base when he's already safe at home. As the record stands now, the BIA has no choice but to grant petitioner asylum on remand, or face another excoriation from our court when the case returns to the same panel a year or two from now.

While today's opinion is particularly egregious, this case is hardly atypical of our circuit's immigration law jurisprudence. Rather, it is one more example of the nitpicking we engage in as part of a systematic effort to dismantle the reasons immigration judges give for their decisions. *See, e.g., Martirosyan v. INS,* 229 F.3d 903 (9th Cir.2000), *vacated and reh'g en banc granted,* 242 F.3d 905 (9th Cir. 2001) (the IJ could not dismiss as "speculative" a draft dodger's claim that had he remained in Armenia he would have been forced to commit war crimes, despite the complete absence of evidence that *any* Armenian soldier had *ever* been compelled to commit such acts); *Shoafera v. INS,* 228 F.3d 1070 (9th Cir.2000) (petitioner established her eligibility for asylum where she first testified to being raped for a nondiscriminatory reason and only after coaching by her counsel said that she was also raped because of her ethnicity); *Bandari,* 227 F.3d 1160 (the IJ may not doubt petitioner's credibility after he made numerous inconsistent statements between his application and his testimony about how and when he was beaten by the police); *Avetova–Elisseva v. INS,* 213 F.3d 1192

(9th Cir.2000) (despite the admission of petitioner's expert, the BIA lacked substantial evidence to conclude that Armenians in Russia were not subject to a pattern or practice of persecution). None of this has anything to do with administrative law, as that concept is known anywhere outside the Ninth Circuit. Nor has it anything to do with the laws Congress has passed and the Supreme Court has interpreted. I emphatically dissent.