KOZINSKI, Circuit Judge,
dissenting in part:
My colleagues grumble that an immigration judge shouldn’t pretend to be a “handwriting expert” or a “forensic laboratory.” Maj. at 1025. But a circuit judge shouldn’t pretend to be an immigration judge. This is yet another tiresome “example of the nitpicking we engage in as part of a systematic effort to dismantle the reasons immigration judges give for their decisions.” Abovian v. INS, 257 F.3d 971, 980 (9th Cir.2001) (Kozinski, J., dissenting from denial of rehearing en banc) (listing other examples).
1. After hearing the testimony of Raj Kumar and his brother Rajinder, the immigration judge (IJ) found as follows:
This Court is of the opinion that [Raj Kumar] submitted fraudulent documents to bolster his claim to asylum. *1032 As seen in collective Exhibit 4, [Raj] attempted to pass off as his own injuries, the photos submitted as part of this Exhibit.... [I]n fact, some of the alleged injuries and photos about them were actually photos of [Raj’s] brother, and not his at all. This attempt to pass off as his own injuries, is consistent with[Raj’s] attempts to deceive this Court about the veracity of his claim to asylum.
Based on this finding of immigration fraud and other inconsistencies in Raj’s testimony and evidence, the IJ made an adverse credibility determination and, not believing Raj’s story, denied his claim for asylum.
Both Congress and the Supreme Court have instructed that an adverse credibility finding is “conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.” 8 U.S.C. § 1252(b)(4)(B); see INS v. Elias-Zacari-as, 502 U.S. 478, 481 & n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Our role is not to substitute our own judgment regarding an asylum applicant’s credibility for that of the IJ; for us to overturn an IJ’s adverse credibility finding, the applicant must present evidence that not only supports a finding of credibility, “but compels it.” Id. at 481 n. 1, 112 S.Ct. 812; Farah v. Ashcroft, 348 F.3d 1153, 1156 (9th Cir.2003). And, when an IJ compiles multiple reasons for disbelieving the applicant, we must accept the IJ’s finding even if only one reason that goes to the heart of the applicant’s claim is supported by substantial evidence. See Li v. Ashcroft, 378 F.3d 959, 964 (9th Cir.2004). The majority dutifully recites this standard of review, see maj. at 1024, but its analysis belies the deference an IJ is due. See Quan v. Gonzales, 428 F.3d 883, 890 (9th Cir.2005) (O’Scannlain, J., dissenting) (“[T]he court has substituted its independent analysis of the record for that of the Immigration Judge ... and, in so doing, has exceeded its authority and intruded upon the proper role of the fact finder.”); Jahed v. INS, 356 F.3d 991, 1002 (9th Cir.2004) (Kozin-ski, J., dissenting) (“[0]ur court seems bent on denying the BIA the deference a reviewing court owes an administrative agency.”).
The heart of Raj Kumar’s asylum application is his claim that he suffered repeated beatings and sustained multiple injuries at the hands of Indian police. To support his contentions, Raj submitted, along with his asylum application, photographs allegedly depicting his injuries. He also presented these photographs as evidence in his hearing before the IJ. Further, after some prodding by the IJ, he presented his brother Rajinder — who had filed his own asylum application, with photographs — to corroborate his claim.
It is undisputed that four of the five photographs Raj submitted were identical to the photographs Rajinder had submitted in his own asylum application. The IJ did not need to engage in “speculation or conjecture,” maj. at 1025, to see that the photos are the same; he needed only compare the two sets of photos in the record. And although we don’t know which brother’s photos were actually depictions of the other brother’s injuries — or whether either set of photos depicted neither brother at all — we do know that both sets of photos could not be what the Kumar brothers claimed them to be.
The majority concedes that at least one of the photographs in Raj’s application “depicts an injury suffered by Rajinder.” Maj. at 1026. And it does not dispute that the injuries Raj claims to have suffered at the hands of the Indian police are the “heart” of his asylum application. This alone is substantial evidence supporting the IJ’s findings. See Li, 378 F.3d at 962 (“An adverse credibility ruling will be upheld so long as identified inconsistencies go to the heart of the asylum claim.” (al *1033 teration and internal quotation marks omitted)). Cf. Mendoza Manimbao v. Ashcroft, 329 F.3d 655, 660 (9th Cir.2003) (“Minor inconsistencies in the record that do not relate to the basis of an applicant’s alleged fear of persecution, go to the heart of the asylum claim, or reveal anything about an asylum applicant’s fear for his safety are insufficient to support an adverse credibility finding.”).
Yet the majority concludes, inexplicably, that Raj did not “attemptf ] to ‘pass off his brother’s injuries as his own.” Maj. at 1027. It then proceeds to engage in its own “speculation and conjecture” about how the photograph of Rajinder’s injury might have found its way into Raj’s asylum application, and been submitted as evidence during the course of Raj’s removal hearings: There might very well have been a good explanation; it’s possible it was the result of carelessness; it could have been a clerical error. See id. at 1026. Were the members of the majority sitting as immigration judges, these hypothetical excuses might have given them a basis for concluding that Raj’s testimony was believable. But they do nothing to undermine the uncontroverted evidence that Raj submitted at least one photo of his brother’s injuries and claimed it as his own, and they certainly do not render irrational the IJ’s conclusion that the phony photograph was part and parcel of a pattern of deception.
Raj had plenty of opportunities to explain why the same photographs appeared in both applications. He could have offered an explanation when he submitted the photographs into evidence at the hearing, or when he described his injuries on direct examination. Further, when the du-plicative photographs were brought to the IJ’s attention during brother Rajinder’s testimony, Raj and his attorney were put on notice of the cause for concern:
[INS ATTORNEY] TO RAJINDER KUMAR
Q: Sir, would you look at Exhibit 6, see if you recognize that document?
A: Yes.
Q: What is that document?
A: That is my, I, I’m the one who filled this out.
Q: It’s an application for asylum?
A: Yes.
Q: And would you look at the photographs. Do you recognize that photograph?
A: Yes.
Q: And who is that of?
A: This is of my foot.
Q: And would you identify this, second photograph?
A: Yes.
Q: What is it?
A: That’s my brother’s—
Q: Your brother’s what?
A: The stitches on his (indiscernible).
Q: And a third photograph, would you identify that?
A: That’s also my brothers.
Q: Why are you putting your brother’s photographs in your file?
A: I did not, maybe it was by mistake. I did not do it myself.
Q: Sir, I’m showing you a photograph of a foot, in your brother’s file. Would you identify the photograph?
A: Yes. That’s my foot.
Q: You know why your photographs are in your brother’s file?
A: I give this, give this to a person named Mohamed. And he put everything, maybe it was mistake or something.
Despite hearing this exchange with his brother, Raj offered no explanation for the discrepancies, and did nothing to confirm *1034 Rajinder’s conjecture that “maybe it was[a] mistake or something.” Raj’s attorney redirected Rajinder for almost an hour, but avoided any mention of the photographs. The IJ then granted Raj a continuance so his attorney could further review Rajinder’s documents; when the hearing reconvened a month later, Raj’s attorney stated that Rajinder’s testimony had been “sufficient,” and that he didn’t need to ask any more questions. Finally, when asked whether Raj wanted to present “anything further [in] the case in chief,” Raj’s attorney responded, “No, Your Honor,” and waived closing argument.
After the IJ made his adverse credibility determination, Raj had a further opportunity to address this issue in his appeal to the BIA. Yet in his brief to the BIA, Raj did not argue that the photographs were erroneously included in the wrong application, or that he was unaware of the inclusion of his brother’s photographs in his asylum application. Instead, he made only a single unilluminating remark in the “Facts” section of the brief: His immigration consultant “put all the photos of the injuries the two brothers suffered into each application without distinguishing them.” Raj doesn’t claim, even in his brief, that he was unaware his brother’s injury was being passed off as his own.
The majority seizes on the single un-sworn sentence in Raj’s brief to the BIA, giving it more weight than eleven separate sworn hearings in front of the IJ. The majority even blames the IJ for failing to ask Raj for an explanation, as if his own counsel was a potted plant. See maj. at 1027. Finally, the majority invents its own version of what must have happened, spinning tales of mea culpas, accidents, and “clerical error[s]” that appear nowhere in the record. See id. at 1026. It’s no wonder Raj didn’t bother to explain the inconsistencies to the IJ; he must have predicted — accurately, as it turns out — that the Ninth Circuit would do it all for him.
2. The majority next holds that “the IJ’s finding that it was ‘unusual’ that Raj did not know where Rajinder was as of the date of the May, 2000, hearing was imper-missibly based upon personal conjecture rather than supportable, cogent reasoning.” Id. at 1028. For support, the majority points out that “Rajinder was working with a trucking company ... and was not easily reachable,” and recounts Raj’s seemingly reasonable testimony that he “did not know that [Rajinder] would also be needed” at the hearing. Id. at 1028.
But the majority paints an incomplete picture, and mischaracterizes the IJ’s findings. The IJ didn’t find it implausible that a long-distance trucker might be difficult to reach; he found implausible Raj’s claim that he had no way of contacting Rajinder: “[Raj] was asked a series of questions about his brother and his whereabouts, and his claim to asylum. Basically, [Raj] testified he did not know where his brother was, nor where he lived or for that matter, his home telephone number.” Even long-distance truckers have homes and telephone numbers, and it’s highly implausible that the two brothers, who escaped torture and traveled thousands of miles together to get to the United States, would then have separated without giving each other any contact information.
The IJ’s skepticism about Raj’s claim that Rajinder was untraceable proved well-founded: When the IJ gave Raj only 15 days to locate his brother and bring him to testify, Rajinder magically materialized.[1] *1035 Once Rajinder showed up at the hearing, the INS was able to secure his consent so the IJ could compare Rajinder’s asylum application to Raj’s. As the IJ stated:
The reason [Raj’s] testimony about his brother[is] salient to his claim, is that [Raj led] this Court to believe he was separate and distinct from his brother, and that they were on their own. Only after [Rajinder’s asylum application] was entered into the record does it show up that both claims were prepared by the same individual.... Only after the brother’s application was presented, did it come to light the photos in one, were used in both. And that some of the alleged injuries to Raj were actually, allegedly Rajinder’s.... That may explain why [Raj] was not inclined to tell this Court, candidly, about the fact that both applications (his and his brother’s) were prepared by the same person. These discoveries also help explain why the respondent did not want this Court to scrutinize both applications together.
In other words, Raj had claimed he and Rajinder had separated after they got to the United States. He did this in order to explain why Rajinder — who could obviously corroborate Raj’s story — was absent from Raj’s asylum hearing. When the IJ refused to buy Raj’s explanation, Rajinder showed up and his presence enabled the IJ to compare the two applications side-by-side. It was only at that point that the IJ was able to see that the same photographs were being offered as evidence in multiple asylum applications, and that the two applications were drawn up by the same individual, on the same day, putting the lie to Raj’s claim that he and his brother had gone their separate ways after coming to America.
This is the nub of the IJ’s reasoning, which the majority ignores, preferring to nitpick the IJ’s isolated statements. But the duplicitous photographs and the alleged inability to lócate Rajinder were not disconnected; they were part and parcel of a single fraud that a factfinder, who sees the lie unfolding before his very eyes, is uniquely qualified to identify. Having seen that (1) Raj claimed to be unable to locate his brother, (2) Raj was indeed able to locate Rajinder within 15 days, and (3) Rajinder’s testimony revealed their deception, the IJ concluded that Raj had intentionally been trying to avoid producing his brother. Far from being “speculation and conjecture,” this was a permissible inference for the IJ to draw based on “supportable, cogent reasoning.” And it strongly supports the IJ’s finding that inclusion of the false photographs was no mistake but a calculated fraud.
3. Even the majority’s analysis of the “Purported Forgery of Ram’s Death Certificate,” maj. at 1025-26, is nothing more than a transparent effort to “impos[e] ever more stringent standards on how [IJs and the BIA] must perform their functions.” Abovian, 257 F.3d at 971. The IJ may not have had a lot of evidence to buttress his conclusion that the death certificate was a forgery, but — certainly in light of the other deceptions being perpetrated by Raj and Rajinder — the majority has pointed to nothing that would compel a contrary conclusion. See Elias-Zaca/rias, 502 U.S. at 481 n. 1, 112 S.Ct. 812; Famh, 348 F.3d at 1156. Instead, the majority simply announces that an “uninformed visual” in *1036 spection of the document by the IJ was insufficient. Maj. at 1025. Although the majority disclaims any “rule in this circuit that IJs must consult experts prior to rejecting documentary evidence,” id. at 1025, that is precisely what the majority requires; without such an expert’s opinion, the IJs determination will simply be written off as “conjecture,” id. at 1025. This addition to the already-crushing burden with which our court has saddled IJs is unsupported by law or precedent.
4. Finally, not content merely with finding the adverse credibility determination unsupported by substantial evidence, the majority goes on to conclude that the IJ’s “fail[ure] to provide Raj with the opportunity to explain” the discrepancies in his application “amounts to the denial of due process.” Maj. at 1026. Raj does not allege a due process violation in his petition for review, and the majority’s unprompted decision to find one is unsupported by our caselaw; it is just another effort to “whittle away the authority and discretion of immigrations judges and the BIA.” Jahed, 356 F.3d at 1007 (quoting Abovian, 257 F.3d at 971) (internal quotation marks omitted).
We have previously held that adverse credibility determinations amount to due process violations in two situations, both relating to the BIA’s appellate review of an IJ’s decision. The first occurs when the IJ finds an applicant credible, but the BIA makes an adverse credibility dew nation on review.[2]
In that situation, the BIA violates the applicant’s due process rights if it does not give him advance notice that his credibility is at issue, and afford him an opportunity to explain the perceived discrepancies. See Campos-Sanchez v. INS, 164 F.3d 448, 450 (9th Cir.1999). Second, if the IJ makes no explicit credibility finding at all, the BIA may not make an independent adverse credibility determination without giving the applicant notice and an opportunity to be heard. See Mendoza Manim-bao v. Ashcroft, 329 F.3d 655, 662 (9th Cir.2003); Abovian v. INS, 219 F.3d 972, 975, 980 (9th Cir.), amended by 228 F.3d 1127 and 234 F.3d 492 (2000), reh’g en banc denied by 257 F.3d 971 (2001).
The supposed purpose of these holdings is to ensure that an applicant has notice of the need to defend his credibility in front of the BIA.[3] When an asylum applicant is before the IJ, however, he is already on notice that his credibility is at issue; one of the primary purposes of an asylum hearing is to determine if the asylum seeker is credible. It is the applicant’s burden at the hearing to prove he should be believed. See 8 C.F.R. § 208.13(a) (burden of proof to establish eligibility for asylum is on the applicant). The IJ has no special burden to “provide [the applicant] the opportunity to explain” why he should be deemed credible. Maj. at 1026. That is the very reason the applicant is in front of *1037 the IJ in the first place — the hearing is his opportunity. And, if at the conclusion of the hearing, the IJ deems the applicant incredible, the applicant — now on notice that his credibility is in doubt — has the opportunity to appeal such a decision to the BIA.[4]
In fact, Raj did appeal the IJ’s decision regarding the death certificate to the BIA, and the BIA upheld the IJ’s adverse credibility determination anyway. Raj may not like the BIA’s decision, but the sufficiency of the process Raj received is not dependent on a favorable result.
5. The larger problem with the majority’s opinion is its know-it-all approach, an error oft repeated when our circuit reviews immigration cases in which an IJ has made an adverse credibility determination.[5] First, the majority lays out the applicant’s story as if it were the gospel truth, making it seem like denial of rehearing will cause a huge miscarriage of justice. Then the majority picks apart the IJ’s findings piece by piece, scrutinizing his every sentence as if it is completely unconnected to the rest of his opinion. Don’t agree with the IJ that the applicant is lying? Not to worry; just label the IJ’s finding “speculation and conjecture.” See maj. at 1025, 1027, 1027-28; Verctr-Villegas v. INS, 330 F.3d 1222, 1231 (9th Cir.2003). Finding it difficult to dispute that the applicant is lying? No problem; just label the inconsistencies “minor,” or “merely incidental to [the] asylum claim.” See Abovicm, 257 F.3d at 979; id. at 978 (listing cases). Having trouble arguing with a straight face that the applicant’s lie doesn’t go to the heart of his claim? No need to fret; just announce a due process violation. See maj. at 1026. The net effect is that any asylum applicant who is a skillful enough liar — and many who aren’t — must be believed no matter how implausible or farfetched their story. See, e.g., Abovian, 219 F.3d at 982 (Wallace, J., dissenting) (applicant alleged “that at least fifteen times in one year he was taken to a hotel room and asked in person, by the president of [Armenia], to join the KGB”). It also means that IJs, who are doubtless chary of being vilified by august court of appeals judges, become even more reluctant to make adverse credibility findings, even when they have good reason to believe the asylum applicant is lying.
None of this bears any resemblance to administrative law, and none of it finds support in the statutes Congress has given us to apply, or the rules the Supreme Court has instructed us to follow. See INS v. Ventura, 537 U.S. 12, 16-18, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam); Elias-Zacarias, 502 U.S. at 481 & n. 1, 112 S.Ct. 812. Although I am bound to follow our circuit’s precedents, I cannot be forced to like them, or to pretend that *1038 they represent the proper fulfillment of our judicial role.
I am dissenting in this case, rather than concurring, however, because even our insubordinate precedents do not support the absurd result the majority has reached. Asylum claims are often difficult because “[t]he specific facts supporting a petitioner’s asylum claim — when, where, why and by whom he was allegedly persecuted — are peculiarly within the petitioner’s grasp. By definition, they will have happened at some time in the past — often many years ago — in a land far, far away.” Abovian, 257 F.3d at 976. This is not such a case. The IJ’s adverse credibility finding here is based on fraud that has taken place recently, here in the United States, as part of the asylum application process. The IJ caught the Kumar brothers red-handed mocking the integrity of our immigration procedures. Once the IJ found that they had committed immigration fraud, he had every right to disbelieve the aspects of their story that did take place long ago and far away, as there is nothing to corroborate that story beyond the Kumar brothers’ good word and some documents they produced. Our jurisprudence instead allows asylum applicants to manufacture evidence, and forces IJs to swallow it. We do not treat other trial judges with such disdain and disrespect, and there is no justification for doing so when immigration judges are involved.
The IJ’s finding that Raj “attempted to pass off[his brother’s injuries] as his own injuries” is supported by substantial evidence. Based on this finding alone, the IJ was justified in making an adverse credibility determination and concluding that “[f]raudulent documents are being used to support [Raj’s] claim to asylum.” If this is not good enough to support an IJ’s adverse credibility determination, then nothing short of the applicant admitting “I’m a big fat liar” will do — and maybe not even that. This is not the law, and I refuse to follow my colleagues in making it so. Rather, I would uphold the IJ’s adverse credibility determination, and deny Raj’s petition for review.

. I have already lodged my disagreement with this nonsensical definition of due process: "[W]hat kind of unfairness can there be when the BIA uses the petitioner’s own words against him?” Abovian, 257 F.3d at 972-73. This is a "constitutional rule [that] exists nowhere outside the Ninth Circuit.” Id. at 972. Whereas I had at least taken solace in the fact that, "[i]f the IJ had ... chosen to disbelieve petitioner, he would have had no constitutional right to get back on the stand and patch up his story,” id. at 973 (emphasis added), this distinction is now out the window. Pretty soon, every denial of asylum will amount to a denial of due process.

. In a third line of cases, we have held that when an IJ makes an adverse credibility determination, and the BIA affirms but on different grounds, due process is satisfied because the applicant was on notice that credibility was an issue that would be before the BIA. See Pal v. INS, 204 F.3d 935, 938-39 (9th Cir.2000).

. We have held that, if an applicant gives an explanation for inconsistencies in his testimony or his supporting evidence, and the IJ neglects to address the explanation given, the IJ’s adverse credibility determination should be reversed as unsupported by substantial evidence. See Kaur v. Ashcroft, 379 F.3d 876, 887 (9th Cir.2004); Hakeem v. INS, 273 F.3d 812, 816 (9th Cir.2001). But this is quite different from holding there is a due process violation in such a situation. And it is different still from requiring an IJ to specifically ask an applicant to provide an explanation in the first place.

. I am not the first of our circuit's judges to point this out; nor, I fear, will I be the last. See, e.g., Jibril v. Gonzales, 423 F.3d 1129, 1138 (9th Cir.2005) (O’Scannlain, J.) ("The Supreme Court has repeatedly instructed us on the proper standard to apply when reviewing an immigration judge’s adverse credibility determination. Time and again, however, we have promulgated rules that tend to obscure that clear standard and to flummox immigration judges, who must contort what should be a simple factual finding to satisfy our often irreconcilable precedents.”).