Alexei CHOUCHKOV; Natalia V. Kondratieva, Petitioners,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 98–70687

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 2000.

Filed July 20, 2000

Arielle N. Bases, Law Office of Enrique Arevalo, South Pasadena, California, for the petitioners.

Frank W. Hunger, Assistant Attorney General, Ronald E. LeFevre, Chief Legal Officer, David V. Bernal, Assistant Director, Office of Immigration Litigation and Hugh G. Mullane (argued), Office of Immigration Litigation, Washington D.C., for the respondent.

Before: PREGERSON and WARDLAW, Circuit Judges, and SHADUR, District Judge.[1]

SHADUR, District Judge:

■ Alexei Chouchkov ("Chouchkov") and his wife Natalia Kondratieva ("Kondratieva") are Russian citizens. They petition for review of a final decision of the Board of Immigration Appeals ("BIA") affirming the denial by an immigration judge ("IJ") of their applications for asylum and withholding of deportation. We have jurisdiction under 8 U.S.C. § 1105a.[2]

Chouchkov claims that he suffered persecution in Russia on account of his political opinion and that he has a well-founded

fear of persecution both for that reason and because he is Jewish. Because Kondratieva's application is dependent on Chouchkov's, her petition is controlled by his under Section 1158. For the reasons given below, we grant the petitions based on the political opinion issue, making it unnecessary to address Chouchkov's second contention, and remand for further proceedings consistent with this opinion.

*Eligibility for Asylum*

■ Under Section 1158 the Attorney General has discretion to grant asylum to aliens who qualify as statutory "refugees." In turn, Section 1101(a)(42)(A) defines a "refugee" as an alien who is "unable or unwilling" to return to the alien's home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." While "[a]n alien who establishes past persecution is presumed to have a well-founded fear of persecution," that "presumption may be rebutted where the conditions in the country have significantly changed" (*Pitcherskaia v. INS*, 118 F.3d 641, 646 (9th Cir.1997)). It is the INS' burden to rebut that presumption by a preponderance of the evidence (*id.*).

■ In terms of Chouchkov's claim based on assertedly political-opinion-motivated past persecution, *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997) teaches:

> After [*INS v.*] *Elias–Zacarias*, [502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992),] an asylum seeker claiming to have been a victim of persecution on account of his or her political opinion must establish, by evidence, four facts: (1) that he or she has been a victim of

---

1. Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

2. All further citations to Title 8 provisions will take the form "Section—," omitting the prefatory "8 U.S.C." Although the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("Reform Act") has replaced Section 1105a with Section 1252, the new review provision does not apply to petitioners such as Chouchkov and Kondratieva whose deportation proceedings commenced before April 1, 1997. Instead, because a final order of deportation was entered after October 30, 1996, the Reform Act's transitional rules apply (see Reform Act § 309(c)(1)). Hence we still have jurisdiction under Section 1105a.

persecution; (2) that he or she holds a political opinion; (3) that this political opinion is known to or imputed by the persecutors; and (4) the ensuing persecution of the victim has been or will be on account of this opinion.

Because we do not reach Chouchkov's claim of his fear of future persecution based on a pattern or practice of persecution targeting members of his religion, we need not explore the different formulation that this Court has established for dealing with such contentions (see *Kotasz v. INS*, 31 F.3d 847, 851–54 (9th Cir.1994)).

### Standard of Review

 Adverse BIA asylum decisions are upheld if supported by "substantial evidence" (*Singh v. INS*, 134 F.3d 962, 966 (9th Cir.1998)). Under that deferential standard "a petitioner contending that the Board's findings are erroneous must establish that the evidence not only *supports* that conclusion, but *compels* it" (*Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995)(internal quotation marks omitted and emphasis in original)).[3] Finally, though limited to reviewing the administrative record, we consider the record in its entirety, including evidence that contradicts the BIA's findings (*Velarde v. INS*, 140 F.3d 1305, 1309 (9th Cir.1998)).

### Background

Chouchkov, now 43 years old, is a Russian of Jewish descent. He worked in his homeland as a nuclear engineer, first for a government-sponsored organization and then beginning in the summer of 1992 as the Commercial Director for a branch of the Institute of Power and Technology called "Atom Kor." Atom Kor is a research organization for state agencies and ministries that is two-thirds funded by the Russian government.[4] As a precondition to Chouchkov's hiring by Atom Kor, a background check by the KGB was required.[5] Chouchkov, whose supervisor was the head of Atom Kor, handled the company's finances and had the right of signature on all financial documents.

In January 1993 Atom Kor became involved in a deal to provide nuclear materials and technology to Iran. Chouchkov, who testified that the deal was approved by the Russian government,[6] strenuously objected to the deal and told his supervisor that he would attempt to keep the deal from being realized. According to Chouchkov, he did not take any affirmative steps against the deal, such as talking to the media, because subsequent threats and intimidation made him feel that his life was in danger.

In terms of Chouchkov's reasons for opposing the proposed deal, he said that Iran was a "terrorist country" and that such a deal was in violation of international agreements. As Chouchkov put it during his hearing, "I am sort of Jewish origin, my mother is Jewish, I didn't want that technology be possibility [sic] used against other countries, the state of Israel included."

3. As *Singh,* 134 F.3d at 966 (internal quotation marks and citations omitted) states:

This strict standard bars a reviewing court from independently weighing the evidence and holding that petitioner is eligible for asylum, except in cases where compelling evidence is shown. Thus, we must deny the Petition unless Petitioner presented evidence so compelling that no reasonable factfinder could find that Petitioner has not established eligibility for asylum.

4. Chouchkov testified that the Institute of Power and Technology was completely government funded but that Atom Kor received about one-third of its funding from private investors.

5. Chouchkov testified that the "KGB" supervised all deals involving nuclear power. While the KGB is no longer the official title of Russia's intelligence service, that term is used throughout the record and is apparently still the term used by many Russians. We will similarly use the term "KGB" for the sake of consistency.

6. Several newspaper articles from 1995 that are in the record confirm that Russia was negotiating that type of a deal with Iran and that the highest levels of the Russian government were involved.

Chouchkov's supervisor reacted by telling him that "you'll be very sorry about this." Evidently Chouchkov's cooperation ·was important because he was needed to sign the contract and bring nuclear samples to Iran.[7]

Thereafter until he left Russia in March 1993, Chouchkov encountered a series of distressing incidents that he views as tactics of intimidation intended to get his cooperation to enable the Iran deal to proceed. Chouchkov's testimony about those incidents was found to be credible by the IJ.[8]

First, Chouchkov received threatening telephone calls from unknown persons, sometimes twice a day, telling him among other things that "if you'll not change your mind either your close relatives or yourself will suffer" and that "[y]ou're [sic] wife can disappear certainly and you'll look for her." Chouchkov believed the calls were from the KGB, because only the people at his office and the KGB knew that he was opposed to the Iran deal. Those callers also said that they knew about his Jewish faith. Chouchkov also ·testified that he was consistently followed by several cars and often saw those vehicles parked behind his building.

Then in February 1993 Chouchkov's car was stolen. On the night of the theft Chouchkov received a phone call asking him, "so have you change [sic] your mind?" While the police soon found the vehicle and the person who had stolen it, the thief was never prosecuted for the crime. Later that month Chouchkov's father was hit by a car that swerved onto "the walking part of the street" and then sped away. Although the father's "left arm was injured and his face and head were traumatized,"

the police ·refused to pursue the matter. Another phone call ensued:

> See what we can do. And why you don't want [sic] to change your decision.

Next month, in March 1993, the Chouchkov–Kondratieva car was rear-ended while parked in a supermarket just after they had walked away from it. Police arrived and identified the driver responsible, but again no criminal charges were filed.[9] And another call came that same evening:

> [Y]ou see how many unpleasant things are happening to you. Have you changed your mind?

Chouchkov believes that all three just-described incidents-the car theft, his father's accident and the car accident-were tactics of intimidation related to the Iran deal.[10] Again it should be recalled that the IJ credited Chouchkov's testimony. And as for the BIA's position, its opinion did not question that the events Chouchkov described took place, but rather whether Chouchkov's testimony implicated the government.

Around the same time, Chouchkov's supervisor again tried to convince him to change his mind, but Chouchkov said his feelings were unchanged. Later Chouchkov was approached by two people, claiming to be from the KGB, who showed him their identification and told him to come with them and sit in their car, ostensibly to "take you to an organization that will talk to you" about ·the Iran deal. When Chouchkov refused the men attempted to use force, but Chouchkov escaped by spraying them with CS5000 gas.

Although Chouchkov then moved to another apartment because he feared for his safety, he then noticed the same two cars following him wherever he went. One

---

7. Chouchkov also testified that Atom Kor would have needed four to five months to give anybody else the authority he had.

8. At the same time, the IJ found Chouchkov's "claims regarding problems because he is Jewish [to] have less credibility...."

9. It is apparently customary in Russia to file criminal charges in such cases.

10. According to Chouchkov:

> [T]he authorities took no action.... There were no cases against those people who committed [those crimes]. As far as I understand, this was organized and that was done in order to influence me.

night he received a call telling him to leave the apartment because his mailbox was on fire. Because he found the call suspicious (and indeed, it turned out there was no such fire), he stayed inside-and he observed nearby one of the cars that had been following him. Chouchkov thus felt that he had "escaped another accident or incident."

Chouchkov and Kondratieva left Russia in late April 1993 and went to Germany on a tourist visa. Even there they received another phone call:

> You can't run away. You have to come with us to Iran and make a deal.

Chouchkov and Kondratieva then fled Germany and stayed in Argentina for approximately two years. In Argentina Chouchkov learned of the "strange death" of his supervisor from Atom Kor. At some point unclear from the record, he learned that two other persons who were involved in the Iran deal had also died.[11] Then in the fall of 1994 he received a threatening fax at work and a threatening phone call at home.[12]

Chouchkov and Kondratieva came to the United States about March 23, 1995. Seven months later, in October 1995, Chouchkov's mother-in-law was attacked in Russia by men demanding to know about her "Jewish relatives" and demanding Chouchkov's address. She was hospitalized for several weeks as the result of a concussion sustained from being hit on the head.

After staying in this country longer than permitted, Chouchkov and Kondratieva conceded deportability but applied for asylum and withholding of deportation. On January 23, 1997 the IJ's · oral decision denied their applications for withholding of deportation and asylum. Next Chouchkov and Kondratieva filed a timely administrative appeal, which was denied by the BIA on May 26, 1998. This timely petition followed.

### Persecution on Account of Chouchkov's Political Opinion

■■■ Chouchkov first lays claim to refugee status based on past persecution by reason of his actual or imputed political beliefs. On that score the BIA said:[13]

> [T]he respondents did not meet their burden of proving that either the government of Russia or those the government was unwilling or unable to control sought to persecute them on account of the lead respondent's [Chouchkov's] actual or imputed political opinion.

Specifically the BIA noted evidence that was said to cast doubt on any involvement by the Russian government: the police assisted Chouchkov after both incidents with his car; the harassing callers never identified themselves; Chouchkov was not arrested for repelling government agents with gas; and the identities of the persons assaulting Chouchkov's mother-in-law were not known.[14]

---

11. Nothing in the record sheds light on the circumstances surrounding those three deaths.

12. Chouchkov testified that both the fax and phone call said that he could not run away and that he would be found wherever he went.

13. It appears from the BIA's opinion that it conducted a de novo review of the record. That being the case, we review the BIA's decision rather than that of the IJ (see *Vongsakdy v. INS*, 171 F.3d 1203, 1206 (9th Cir. 1999)).

14. Chouchkov's credibility was also called into question by the BIA, without explicitly overturning the IJ's credibility finding, by

highlighting two inconsistencies between Chouchkov's testimony and his written statements. But the BIA was in error in thus casting doubt on the IJ's credibility determination, because the record discloses that Chouchkov was not afforded an opportunity to explain the perceived inconsistencies (see *Campos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir.1999), requiring the BIA to provide a reasonable opportunity to explain inconsistencies that form the basis of a denial of asylum when credibility had not earlier been at issue). If on remand the BIA were to persist in its expression of doubt, it must conform to the directive in *Campos–Sanchez, id.* at 450–51 & n. 1. And relatedly, we must repeat once more the message delivered earlier this year in *Cordon–Garcia v. INS*, 204 F.3d 985, 993 (9th Cir.2000):

But the BIA's decision was not supported by substantial evidence. Before we discuss the primary basis for that ruling, we note that the BIA made several empirical assumptions that lack evidentiary support.[15] For example, the BIA found it peculiar, if what was at work was a plot targeting Chouchkov, that the police captured both the person who stole his car and the person who later rammed it. But that presupposes (without evidence) that Russian officialdom are all on the same page and operate with seamless efficiency. It also assumes (against all likelihood) that information regarding a secret deal with Iran would be spread to the police in Moscow. Further, even if it were to be assumed that the police and the KGB *were* operating in tandem, the BIA's statement that it was odd that Chouchkov "never reported the [threatening] calls to the police" loses its logical force because Chouchkov certainly believed the KGB was behind those events. In their totality the BIA's assumptions amount to little more than conjecture, which "is not a substitute for substantial evidence" (*Lopez–Reyes v. INS*, 79 F.3d 908, 912 (9th Cir.1996)).

But all this is only a preface to three points that compel the conclusion that the several incidents amounted to government-sponsored persecution. We turn next to those considerations.

First, all of the incidents before Chouchkov left Russia occurred in a span of 2–1/2 months. While one such incident that essentially coincided with Chouchkov's opposition to the Iran deal might perhaps be discounted as mere coincidence, surely all of them cannot. It is like multiplying fractions: If for example a 50–50 chance exists that a single incident is purely accidental, those odds become exponentially greater with the occurrence of each ensuing incident. And when the other more than-suspicious surrounding circumstances reviewed hereafter are factored into the calculation, making the likelihood of sheer chance of each incident a long shot, the odds resulting from multiplying those much smaller fractions tend to become extraordinarily high.

Second, and closely related, are the numerous other undisputed incidents in the record that cannot be labeled as mere chance misfortune: Chouchkov continuously received threatening phone calls regarding the Iran deal-many strongly implying that the "accidents" were not at all accidental; he was routinely followed by unknown persons; he was approached about the Iran deal by two persons claiming to be KGB agents; and his mother-in-law was attacked in her home after Chouchkov had fled Russia. When those events are also built into the calculation, there are astronomically high odds against the entire series of incidents having been aleatory in nature. It is truly extraordinary for the BIA to have ascribed no significance to those later events, which were part of Chouchkov's undisputed testimony that the IJ found entirely credible. To the BIA those other incidents were viewed as simply part of a work-related dispute, lacking the requisite nexus with the Russian government.

That leads into the final point: that the record compels the conclusion that Atom Kor is an arm of the Russian government. It is undisputed (1) that Atom Kor is two-thirds government funded, (2) that Atom Kor's parent company is completely gov-

---

Once again, we strongly encourage the BIA to discuss or expressly adopt, rather than ignore, the IJ's credibility findings in an asylum case.

**15.** It must be stressed that what sounds peculiar in one country may be the norm in another. Consequently, non-evidence-based assumptions about conduct in the context of other cultures must be closely scrutinized. See, e.g., *Perez–Alvarez v. INS*, 857 F.2d 23,

24 (1st Cir.1988), incorporating by reference and adopting a dissenting BIA member's opinion that said in part:

As a general rule, in considering claims of persecution I think it is highly advisable to avoid assumptions regarding the way other societies operate. Time and again this Board has considered appeals in which assumptions of this nature have been proven to be totally wrong. . . .

ernment funded, (3) that Chouchkov had to be and was investigated by the KGB in order to obtain his job with Atom Kor, (4) that the KGB supervised the proposed Iran deal and all deals involving nuclear power and (5) that the deal with Iran had the attention of the highest levels of the Russian government. After all, Atom Kor was not selling agricultural products to Canada-it was distributing nuclear technology to Iran. It is scarcely a surprise that, as Chouchkov attested, the agreement with the Iranians "was approved on the governmental level between the governments of Russia and Iran."[16] Those factors were not even discussed by the BIA, which appears to have assumed that Atom Kor was a non-governmental entity.

In sum, any reasonable finder of fact would have to conclude that there was a concerted governmentally-linked (at a minimum) effort to intimidate Chouchkov into cooperating with the Iran deal.[17] Substantial evidence does not support any contrary determination by the BIA.

It is equally evident that the intimidation was on account of Chouchkov's political opinion or an imputed political opinion. Here the opinion at issue is Chouchkov's belief that the Russian government should not be selling nuclear technology to Iran.[18] Not only was that a known belief on his part, but on the uncontroverted record it was the only explanation for the harassment of Chouchkov and his family.

Finally, we hold that the intimidation Chouchkov suffered rises to the level of "persecution" under Section 1101(a)(42)(A) because it involved "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive" (*Ghaly*, 58 F.3d at 1431) (quotation marks and citation omitted).[19] As the record reflects, Chouchkov's father and mother-in-law were brutalized and Chouchkov had every reason to fear for his own life. Chouchkov has thus met the four-point test set forth in *Sangha*, 103 F.3d at 1487 and, because he has thus demonstrated past persecution, has raised a rebuttable presumption of a well-founded fear of future persecution. And because that persecution was "such that [Chouchkov's] life or freedom was threatened" (8 C.F.R. § 208.16(b)(2)), he has the benefit of the further rebuttable presumption that he is entitled to withholding of deportation (*Surita v. INS*, 95 F.3d 814, 821 (9th Cir. 1996)).

### Conclusion

For the reasons we have stated, the BIA's determination that Chouchkov was not previously persecuted on account of his political opinion lacks the support of substantial evidence. Any reasonable finder of fact would be compelled to conclude that Chouchkov was the victim of persecution such that his life or freedom was threatened on account of his political opinion.

16. Chouchkov relatedly testified:
 Well, I don't think, I'm positive about it. Because all the deals, all the operations, all the work in the field of nuclear power are conducted under the supervision of intelligent [sic] service. I know this very well just from my previous position when they [sic] worked for the Ministry of Power. Well, the more so if the deal is of international character.

17. We do not exclude the possibility that any of the described incidents was merely a random accident. But when the record is viewed in its totality, it is obvious that Chouchkov was a target of intimidation. In that respect, *Borja v. INS*, 175 F.3d 732, 736 (9th Cir.1999)(en banc) teaches that Chouch-

kov need only have presented "evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or implied protected ground"-and he has surely done that and more.

18. As Chouchkov testified:
 My opinion is and my actions in my life were, well, I tried to do my best to prevent the filtration of Soviet technology in the nuclear area to other countries mostly harassed [sic] countries such as Iran and others.

19. For a discussion of the very fact-specific process for determining what constitutes persecution, see *Singh*, 134 F.3d at 966–68.

Because that gives rise under 8 C.F.R. §§ 208.13(b)(1)(i) and 208.16(b)(2) to rebuttable presumptions that the applicant's fear of future persecution is well founded and that the applicant will face threats to life or freedom if returned to his country, the INS had the burden to show by a preponderance of the evidence that conditions had changed to such an extent as to negate those presumptions. In order to satisfy its burden, the INS was required to introduce evidence that, on an individualized basis, served to rebut the applicant's specific grounds for his well-founded fear of future persecution (see *Osorio v. INS,* 99 F.3d 928, 932–33 (1996). Individualized assessment is particularly important here, where the evidence shows that Chouchkov continued to be pursued by harassment and threats (and worse) by reason of his opposition to the nuclear transaction with Iran long after it might have been expected to make a difference in practical terms-after all, it would have seemed easy to replace Chouchkov .with a more complaisant signatory who could have signed off on the deal, and then just to write Chouchkov off as a temporary inconvenience. Instead the uncontroverted course of conduct shown in the record is consistent only with a pattern of attempted vengeance and retribution for the very fact of Chouchkov's being a political dissident.[20]

We have previously held that remand is not necessary when it is apparent from the record that was before the BIA that country conditions have not changed (see *Duarte de Guinac v. INS,* 179 F.3d 1156, 1164 (9th Cir.1999)). Although that cannot be said with certainty in this instance, we expect the INS, when reviewing that record on remand, to take heed of the substantially heavier burden that it bears to show that Chouchkov would be truly free of a well-founded fear that his past persecution would resume and that he would not face threats to his life or freedom if returned to Russia.

One final note. Chouchkov has asked that we hold his case in abeyance pending the BIA's decision on his Motion To Reopen to enable him to apply for relief based on the United Nations Convention Against Torture. But if the BIA were to rule adversely to him after the present remand, he will have the right to petition this court again-and he could then request a stay if his Torture Convention motion were to be in danger of being mooted by his deportation. We therefore deny his current request for a stay.

We therefore remand for a determination, consistent with this opinion, whether the presumptions in Chouchkov's favor have been effectively rebutted by the evidence in the record. Any further appeal in this action will return to this panel.

PETITION GRANTED and CASE REMANDED.

---

**20.** In that respect, we recognize that several years have passed since the last incident adduced by Chouchkov. But there is, we trust, good reason to regard the United States as a safer haven than others against such tactics, thus discouraging further attempts at retribu-

tion while Chouchkov and Kondratieva have been in this country. Even so, we note that the physical attack on Kondratieva's mother, attempting to learn petitioners' whereabouts, occurred after they had moved here.