**Rossitza Koleva POPOVA and Nadejda Petrova, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 00–70429.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 11, 2001

Filed Nov. 28, 2001

Thipphavone P. Ark, Ark & Wiley, San Francisco, California, Virender Kumar Goswami, San Francisco, California, attorneys for the petitioners.

Stephen J. Flynn, Department of Justice, Washington, D.C., Anthony W. Norwood, Department of Justice, Washington, D.C., attorneys for the respondent.

Before: PREGERSON and RAWLINSON, Circuit Judges, and WEINER, District Judge.*

* The Honorable Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

PREGERSON, Circuit Judge:

Rossitza Koleva Popova ("Popova"), a Bulgarian native and citizen, petitioned for review of the Board of Immigration Appeals' ("BIA's") decision to deny her request for asylum and withholding of deportation. The BIA recognized that Popova suffered "reprehensible" treatment in Bulgaria, but denied Popova's petition because she failed to establish that this treatment was "on account of" her political opinion or membership in a particular social group. The BIA additionally dismissed her motion to remand her asylum petition to the Immigration Judge ("IJ") so that she could pursue relief pursuant to section 20 of the Nicaraguan Adjustment and Central American Relief Act ("NACARA"). For the following reasons, we grant Popova's petition, vacate the BIA order, and remand for further proceedings.

## I.

Rossitza Koleva Popova ("Popova") is a 43–year–old citizen of Bulgaria. Her daughter, Nadejda Petrova, is sixteen years old.[1] Popova was born in Stara Zagora, a small town in Bulgaria. Popova comes from a religious family, as her last name reflects: "Popova" is Bulgarian for priest, and signifies that a family member—in this case, Popova's grandfather— was a priest.

Popova's parents and grandparents were persecuted because of their religious and anti-communist beliefs and connections. Popova's grandfather was repeatedly beaten because of his religious activities. When she was nine years old, Popova witnessed her grandfather get beaten at her family's home until he was covered in blood. In 1971, Popova's family's home was confiscated and razed so that another building could be constructed in its place. As a result, Popova and her parents were forced to stay with her mother's family from 1971 to 1973, where nine people shared three bedrooms. A few months after her family's home was confiscated, Popova's father was sent to an area of Russia contaminated by radiation, where he was ordered to cut trees for twelve hours a day in snow as high as his chest. As a result of this hard labor, Popova's father became ill.

Popova was trained as a pediatrician. She was sent by government officials to the Soviet Union for her medical education, where she was additionally required to take classes in atheism and communism. Popova believes the government sent her to Russia for her medical education so that she could be re-educated regarding communist ideals. After completing her studies, Popova returned to Bulgaria and was employed as a pediatrician at a state-run hospital. At the hospital, she was harassed by other staff members because of her religious surname and her perceived anti-Communism. Staff joked that she should perform liturgies for children who were about to die because her grandfather had been a priest. Two or three times, policemen harassed Popova at the hospital. These officers told Popova that if she did not change her last name, she would be fired from the hospital. When Popova refused to change her last name, she was, indeed, fired.

Popova then began working in an outpatient clinic in Stara Zagora. Her supervisors at the clinic persecuted and harassed her. She was, for example, ordered to prepare material against God and to share it with her colleagues at the clinic. When she refused to prepare these materials, her pay was cut.

In 1989, Popova became a member and the local chapter secretary of an anti-communist group in Bulgaria called "Podcre-

1. Popova's daughter is included in Popova's application for asylum.

pa," or "Union of Democratic Party." As the local chapter secretary of Podcrepa, Popova organized meetings and demonstrations against the government. Government officials repeatedly interrogated, harassed, and threatened Popova because of her participation in Podcrepa.

After participating in a demonstration in opposition to the house arrest of Dr. Konstantin Trenchev, the founder of the local chapter of Podcrepa, Popova was assaulted and arrested by the police and held overnight at the police station. During her detention, the police questioned Popova about her political activities. During this interrogation, a police officer held a gun to Popova's head and said: "Why do you want to die when you are so young? You think about your family better, than think about politics." On another occasion, police officers came to Popova's work and told her that if she did not stop her political activities, she would be imprisoned. During that same time, Popova began receiving anonymous phone calls, in which several different male callers threatened Popova by telling her to curtail her political activities if she and her family wanted to live and "see freedom." She continued to receive threatening telephone calls until she fled to the United States.

Popova testified that the harassment she suffered based upon her religion and political associations took a physical toll. Popova developed insomnia, a heart murmur, and suffered depression.

On September 27, 1990, Popova's husband fled from Bulgaria to the United States. After his departure, the harassment and persecution of Popova escalated. The police repeatedly interrogated her about her husband's location and activities. In the first such interrogation, Popova was detained at the police station for four hours. Subsequently, the police came to Popova's house twice, and interrogated her there. After her husband's departure, Popova's telephone was disconnected for two months, and was repeatedly disconnected thereafter, until she fled to the United States. Each time her telephone was reconnected, Popova's telephone number was changed without her knowledge, and she would be unable to determine her telephone number until someone mistakenly called her and she could learn what number they had dialed. Popova believes that her telephone was disconnected to undermine her political activities, many of which were conducted over the telephone.

Two months after her husband's departure, in November 1990, Popova returned from work to find that the door of her fifth-floor apartment had been set on fire, and she smelled gasoline in the air. Popova's was the only apartment in her apartment complex that was burned. Popova called the police, but they never came to investigate this crime.

That same month, Popova went to Turkey for two days, with an organized tour group, in search of a way to get to the United States. Popova returned to Turkey in May 1991, with another tour group, still seeking a way to get to the United States. In the spring of 1991, Popova was able to get two tourist visas, for herself and her daughter, to go to the United States. Popova and her daughter arrived in the United States on August 8, 1991.

Documents submitted at Popova's deportation hearing reflect that police officers have been looking for Popova since her departure. In May 1993, Popova's mother wrote her that "someone from the police came to ask us if you are in America, when you are returning, are you going to work, and, in general, where are you." Svoboda Nedeva Ianakieva ("Ianakieva"), a journalist for Bulgarian radio and television and a founder of Podcrepa, testified that members of the government "scare me all the time . . . . they scare me to kill

me, and they scare me to ... send me to prison." Ianakieva additionally testified that two of her associates, with whom she worked against the communist leader of the radio, were killed in a staged automobile accident.

Popova filed applications for asylum and withholding of deportation to Bulgaria pursuant to former INA § 208(a) [8 U.S.C. § 1158(a)] and INA § 243(h) [8 U.S.C. § 1253(h)]. On October 16, 1992, the Immigration and Naturalization Service ("INS") denied Popova's applications and placed her in deportation proceedings by filing an Order to Show Cause charging Popova and her daughter with being deportable for remaining in the country longer than authorized, pursuant to INA § 241(a)(1)(B). Popova and her daughter appeared before an Immigration Judge ("IJ") on December 9, 1992, and admitted their deportability, but renewed their requests for asylum and withholding of deportation to Bulgaria. In the alternative, Popova and her daughter sought voluntary departure. At the conclusion of a hearing on September 16, 1993, the IJ denied Popova's application for asylum and withholding of deportation, and granted her request for voluntary departure.[2]

Popova appealed the IJ's decision to the BIA. While the appeal was pending, Popova filed a Motion to Remand so that she could pursue relief pursuant to section 203 of the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Title II of Pub.L. No. 105–100, 111 Stat. 2193 (1997) *amended by* Pub.L. No. 105–139, 111 Stat. 2644 (1997). On March 16, 2000, the BIA dismissed the appeal and denied the Motion to Remand. After reviewing the record and the IJ's Order, the BIA concluded that the IJ demonstrated "a rea-

sonable exercise of discretion based upon the record." The BIA concluded, in relevant part:

> While we agree with the Immigration Judge that the treatment that [Popova] described is reprehensible, we further agree with the Immigration Judge's conclusion that the evidence presented by the respondent does not support her claim that the harm was caused "on account of" her political opinion or her membership in a particular social group. *Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993).... We note that the lead respondent was permitted to pursue her medical education (even if outside Bulgaria), was permitted to travel outside Bulgaria on several occasions, and until her departure, the respondent worked as a physician in several government run medical facilities. Accordingly, we find no error in the Immigration Judge's determination that the respondent failed to demonstrate that a reasonable person in her circumstances would fear persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

The BIA additionally concluded that Popova and her daughter did not qualify for benefits under NACARA because they did not enter the country on or before December 31, 1990.

## II.

### A. Standard of Review

Because Popova's deportation proceedings were pending before April 1, 1997, and she received her final order of deportation from the BIA after October 30, 1996, IIRIRA's transitional rules apply. *Kalaw v. INS*, 133 F.3d 1147, 1150 (9th

---

**2.** The IJ noted that Popova had represented that her daughter had been returned to Bulgaria during the time that the petition was outstanding but, finding no independent evidence of that fact, ruled regarding both Popova and her daughter, as though they were both before the IJ.

Cir.1997). Accordingly, this Court has jurisdiction to review the BIA's final order under Section 106(a) of the INA, 8 U.S.C. § 1105a(a) (1994), *as modified by* Section 309(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. 104–208, 110 Stat. 3009 (1996).

■■■ This Court's review is "limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Garrovillas v. INS,* 156 F.3d 1010, 1013 (9th Cir.1998) (citing *Ghaly v. INS,* 58 F.3d 1425, 1430 (9th Cir.1995)). Legal determinations made by the BIA are reviewed *de novo. Hartooni v. INS,* 21 F.3d 336, 340 (9th Cir.1994). Factual determinations by the BIA are reviewed under the substantial evidence standard. *Singh v. INS,* 134 F.3d 962, 966 (9th Cir.1998). Substantial evidence can be found lacking only if the applicant shows that the evidence which she presented "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *see Prasad v. INS,* 47 F.3d 336, 338 (9th Cir.1995). Decisions by the BIA to deny a Motion to Remand are reviewed using the abuse of discretion standard, regardless of the basis of the applicant's request for relief. *Konstantinova v. INS,* 195 F.3d 528, 529 (9th Cir.1999) (citing *INS v. Doherty,* 502 U.S. 314, 324, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992)).

**B. Popova is eligible for a discretionary grant of asylum from the Attorney General.**

■■■ Popova is eligible for a discretionary grant of asylum from the Attorney General if she is a "refugee," as defined by section 101(a)(42)(A) of the Immigration

Nationality Act ("INA"), 8 U.S.C. § 1101(a)(42)(A). *Ernesto Navas v. INS,* 217 F.3d 646, 654 (9th Cir.2000). In that section, a "refugee" is defined as an individual unable or unwilling to return to her home country because of "a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* (citation omitted). An applicant who establishes past persecution is presumed to have a well-founded fear of future persecution. *Id.* An asylum seeker who asserts that he or she has been a victim of persecution on account of his or her protected status must show: (1) that he or she has been a victim of persecution; (2) that he or she is a member of a protected group; (3) that this protected group status is known to or imputed by the persecutors; and (4) the ensuing persecution of the victim has been or will be on account of this protected group status. *Sangha v. INS,* 103 F.3d 1482, 1487 (9th Cir.1997).

**1. Popova established, with clear and convincing evidence, that she was persecuted "on account of" her religion and political opinion.**

The BIA adopted the IJ's conclusion that Popova's testimony was credible, and concluded that Popova suffered "reprehensible" treatment, but denied her relief because Popova had not demonstrated that her persecution was "on account of" her protected status.[3] Popova asserts that the evidence shows that she was persecuted on account of her religion and political opinion, and asserts that no reasonable factfinder could find otherwise. We agree.

■■■ Persecution is conducted "on account of" a statutorily protected status where an applicant holds such a status and

---

**3.** The BIA concluded that Popova was not persecuted on account of political opinion or social group, but did not address whether

Popova was persecuted on account of her religion.

her persecutors threatened her "because of" it. *Ernesto Navas,* 217 F.3d at 658. To establish a correlation between Popova's persecution and her political opinion and religion, she must show, by direct or circumstantial evidence, her persecutors' motive. *Elias–Zacarias,* 502 U.S. at 483, 112 S.Ct. 812. Proof of persecution " 'solely' " on account of her protected status is not, however, required. *Borja v. INS,* 175 F.3d 732, 735 (9th Cir.1999) (en banc) (quoting *Osorio v. INS,* 18 F.3d 1017, 1028 (2d Cir.1994)). Indeed, as long as "one motive" for the persecution is a statutorily protected ground, "the requirements have been satisfied." *Singh v. Ilchert,* 63 F.3d 1501, 1509–10 (9th Cir.1995).

In reaching its conclusion that Popova was not persecuted on account of any protected status, the BIA relied on the facts that Popova "was permitted to pursue her medical education (even if outside Bulgaria), was permitted to travel outside Bulgaria on several occasions, and until her departure, the respondent worked as a physician in several government run medical facilities." As an initial matter, the basis of the BIA's conclusion—that Popova would not have been educated or allowed to work or travel had she been a subject of persecution—is a "non-evidence-based assumption[ ]" regarding conduct in another culture, and does not amount to "substantial evidence" in support of the BIA's conclusion. *Chouchkov v. INS,* 220 F.3d 1077, 1083 (9th Cir.2000).

Indeed, the BIA's conclusion that Popova was not persecuted "on account of" her religious and political affiliations because she received education and employment from the government is not supported by the evidence. Popova's medical education was conditioned upon her participation in a re-education process in Russia, where she was forced to take classes in atheism and communism in order to graduate. Popova "worked as a physician in several govern-ment run medical facilities," but was harassed by supervisors and fellow employees, and threatened by police officers at the facilities, who said she would be fired if she did not change her name. Moreover, Popova was fired from her first job, and her salary was cut at her second job.

The BIA additionally ignored direct and substantial evidence in the record that compels the conclusion that the persecution Popova suffered was "on account of" her political and religious affiliations. Popova and her family were undeniably persecuted on account of the family's name and religious ties in her youth. Popova was additionally singled out at work on account of her religion when her associates told her to read liturgies for dying children, prepare atheistic materials, and change her name. Popova was fired from one job and her salary was cut in another because she refused these demands.

In 1989, when Popova became involved with Podcrepa, she began to receive threats that were explicitly tied to her political involvement. When a police officer held a gun to Popova's head during an interrogation, he told her to think more about her family and less about politics. When police officers came to Popova's work, they told her that she would be imprisoned if she did not end her political activities. When Popova received anonymous and threatening telephone calls, she was told that if she did not curtail her political activities, she and her family would not live and "see freedom." Although Popova's repeated telephone difficulties and the arson at her apartment are only circumstantially tied to her political opinions, this series of events, viewed in their entirety, lead to the conclusion that their occurrence can not be coincidental.

It is like multiplying fractions: If for example a 50–50 chance exists that a single incident is purely accidental, those

odds become exponentially greater with the occurrence of each ensuing incident. And when the other more-than-suspicious surrounding circumstances reviewed hereafter are factored into the calculation, making the likelihood of sheer chance of each incident a long shot, the odds resulting from multiplying those much smaller fractions tend to become extraordinarily high.

*Chouchkov,* 220 F.3d at 1083. In light of this confluence of events, a reasonable fact-finder must conclude that the persecution Popova suffered was on account of her religion and political opinion. Accordingly, the BIA's conclusion that the connection between Popova's political opinion and her persecution is speculative was clearly erroneous and must be reversed.

**2. The INS did not rebut the presumption of future persecution afforded Popova on account of her past persecution.**

 A finding of past persecution raises the presumption that an asylum-seeker has a well-founded fear of future persecution, rebuttable by a showing, by a preponderance of the evidence, that conditions have changed sufficiently so as to overcome that presumption. *See* 8 C.F.R. § 208.13(b)(1)(i) (1999); *Singh v. Ilchert,* 69 F.3d 375, 378 (9th Cir.1995). The INS is obligated to "introduce evidence that, on an individualized basis, rebuts a particular applicant's specific grounds for his well-founded fear of future persecution." *Ernesto Navas,* 217 F.3d at 662. "Information about general changes in the country is not sufficient." *Garrovillas,* 156 F.3d at 1017. In this case, neither the BIA nor the IJ considered whether the INS met its burden of showing changed country conditions. We can, however, review the INS's submissions to determine "whether there is room for doubt as to the proper result with respect to the country conditions issue." *Ernesto Navas,* 217 F.3d at 662. If the INS has not met its burden of production, it is unnecessary to remand this case to the BIA for further findings on this issue. *Id.*

The INS submitted the 1989 and 1992 United States Department of State Reports on Human Rights Practices in Bulgaria ("1989 Country Report" and "1992 Country Report," respectively) as evidence of Bulgaria's changed conditions. The 1989 Country Report reflects "harsh repression" and the prohibition of and punishment for "[t]he exercise of such basic human rights as freedoms of speech, press, assembly, and religion." It additionally reports that "a number of peaceful demonstrators were killed by internal security troops in May and September," "[t]here were reports of prison deaths caused by torture and beatings," and "Bulgarians were detained, tried, imprisoned, and exiled for criticism and actions which were political in nature."

The 1992 Country Report concludes that Bulgaria's "overall human rights performance was *generally* good in 1992" and that "[f]reedom of press, assembly, religion, speech, association, and travel were *generally* respected," but reports that "little progress was made toward establishing a clear judicial basis for addressing human rights complaints" and discrimination "remained a problem." (Emphasis supplied). Although the Bulgarian Constitution "protects the freedom and confidentiality of correspondence," the 1992 Country Report finds that "[c]harges persisted ... that the intelligence services continued in some instances to monitor correspondence and telephone communications, particularly those of government critics such as union and opposition leaders." The 1992 Country Report additionally reflects that attempts to investigate prior abuses by the Communist regime were stifled when a group, "which claimed to represent per-

sons who were imprisoned and tortured under the Communist regime," was not given government authorization to investigate these abuses "on the questionable grounds that its stated aim, to gather criminal information, usurped a state function."

The 1992 Country Report additionally reflects continued repression of Podcrepa—the anti-communist group to which Popova belonged. Although the Bulgarian Constitution "guarantees the right of all workers to form or join trade unions of their own choosing," the 1992 Country Report reflects that the government preferred KNSB, "the successor to the trade union integrated with the former Communist Party," and marginalized Podcrepa, described as a "trade union confederation" that had "formed a tactical alliance with KNSB on many, but not all, union and political issues." Indeed, the 1992 Country Report reflects that Dr. Konstantin Trenchev, Podcrepa's founder, for whom Popova demonstrated during his house arrest in 1990, "continue[d] to play an active role in union affairs and politics," and had been threatened with criminal prosecution by the government. Moreover, the 1992 Country Report reflects an increased reluctance by the government to "negotiate directly with the unions . . . and criticized their activities sharply."

Based on the record, we find the presumption afforded to Popova stands unrebutted. Although the INS produced evidence illustrating that the conditions in Bulgaria improved from 1989 to 1992 as a *general* matter, it introduced no evidence to meet its burden of showing that there has been a change in the conditions that would affect Popova individually. Indeed, the 1992 Country Report reflects that the leader of Podcrepa, with whom Popova closely associated, continued to be threatened with criminal prosecution by the government. There is, in sum, nothing sub-

mitted by the INS that rebuts Popova's legitimate fears of future harassment, threats, and imprisonment based upon her political opinion and involvement in Podcrepa.

We, therefore, conclude that Popova's undisputed and credible testimony compels the conclusion that she was persecuted on account of her religion and her political opinion, and that she has convincingly shown a genuine and well-founded fear of future political persecution should she return to Bulgaria. Popova is, therefore, eligible for a discretionary grant of asylum.

**C. Popova is entitled to a withholding of deportation to Bulgaria because her life and freedom were threatened there.**

Pursuant to 8 U.S.C. § 1253(h), the Attorney General is required to withhold deportation of an individual who establishes a "clear probability" that she will be persecuted if she is returned to that country. *Korablina v. INS,* 158 F.3d 1038, 1045 (9th Cir.1998). To show a "clear probability" of persecution, an applicant must show that it is "more likely than not" that she would be persecuted if she returned to that country. *Id.* at 1046. If an applicant's " 'life or freedom was threatened in the proposed country of deportation . . . it shall be presumed that [her] life or freedom would be threatened on return to that country.' " *Surita v. INS,* 95 F.3d 814, 821 (9th Cir.1996) (quoting 8 C.F.R. § 208.16). This presumption can be rebutted "only if 'a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there.' " *Id.*

Popova's life and liberty were repeatedly threatened while she lived in Bulgaria.

The police put a gun to Popova's head and repeatedly threatened her with prison, and anonymous callers threatened her life and freedom. Police were looking for Popova two years after she had left Bulgaria for the United States. Based upon this undisputed evidence, it must be presumed that her life and freedom would be threatened should Popova return to Bulgaria. The evidence submitted by the INS is insufficient to rebut this presumption. Indeed, the 1992 Country Report describes the continued persecution of the leader of Podcrepa, and threats by the government to imprison him for his past activities. Accordingly, we conclude that Popova is entitled to a withholding of deportation.

## CONCLUSION

For the foregoing reasons, Popova's petition is granted. The INS's decision that Popova was ineligible for asylum because she did not show that her persecution was "on account of" her protected status is not supported by substantial evidence. To the contrary, we find that Popova presented compelling evidence that demonstrates a well-founded fear of future persecution based on her religion and political opinion. We also find that Popova has established that her life and freedom were threatened, and that she is, therefore, entitled to a withholding of deportation to Bulgaria.[4]

PETITION FOR REVIEW is GRANTED. WITHHOLDING OF DEPORTATION to Bulgaria is GRANTED. The decision of the BIA is VACATED and the case is REMANDED.

---

4. In light of these conclusions, it is unnecessary to address Popova's NACARA claim.